UNITED STATES of America

v.

Navron PONDS, Defendant.

No. CR. A. 02–0495(JDB).

United States District Court,
District of Columbia.

Oct. 28, 2003.

Preston Burton, Caplin & Drysdale, Chartered, Washington.

Mark Dubester, Assistant United States Attorney, Washington.

### MEMORANDUM OPINION

BATES, District Judge.

Defendant Navron Ponds was indicted on December 10, 2002, in a seven count indictment charging him with five counts of tax evasion in violation of 26 U.S.C. § 7201, felony fraud under D.C.Code §§ 22–3821 and –3822, and wire fraud in violation of 18 U.S.C. § 1343, all relating to a multi-year scheme involving the non-payment of personal income taxes. On July 7, 2003, defendant was also charged in a parallel information with five counts of failure to pay income taxes or file income tax returns in violation of 26 U.S.C. § 7203. Following a seven-day trial, on July 16, 2003, a jury returned a verdict convicting defendant on all counts.[1]

Prior to trial, defendant moved pursuant to *Kastigar v. U.S.*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and *United States v. Hubbell*, 530 U.S. 27, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000), for a hearing to determine whether the government's case was improperly tainted by defendant's prior production of documents and grand jury testimony under a grant of immunity and, based on that alleged taint, for dismissal of all charges. On June 3, 2003, the Court granted defendant's request for a *Kastigar* hearing, and thereafter held a two-day evidentiary hearing to determine whether the government's case was tainted by defendant's prior production of documents and grand jury testimony under a grant of use immunity pursuant to 18 U.S.C. § 6002. *See* Mem. Op. (June 3, 2003) at 7. The Court concluded that such a hearing was warranted because the government conceded awareness during the course of its investigation that a *Kastigar/Hubbell* issue was looming, be-

---

**1.** The parties agree that the misdemeanor convictions under the information must be vacated, in light of the felony tax evasion convictions based on the same events.

cause the documents and information produced under "act of production" immunity in an earlier Maryland federal proceeding may have been known to Internal Revenue agents or prosecutors involved in this case, and because it was not a demonstrably "foregone conclusion" that the records produced by defendant under immunity existed and were in his possession. *Id.* at 7–8. Accordingly, the Court was concerned that defendant's act of production of documents to the Maryland grand jury might have contained implicit testimonial representations or acknowledgments that were previously unknown to the government, and therefore "this case on the surface would seem to involve implicit, and potentially incriminating, testimonial statements through the production of documents in response to a subpoena." *Id.* at 8 (citing *Hubbell*, 530 U.S. at 44–45, 120 S.Ct. 2037, and *Fisher v. United States*, 425 U.S. 391, 411, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)).

An evidentiary hearing commenced on June 5, 2003. The Court required that the hearing focus on the facts, circumstances and decisions regarding the grand jury subpoena to defendant, the acquisition of an *ex parte* order to obtain defendant's tax records, and the acquisition of search warrants for defendant's business and residence. As noted in the Court's June 3, 2003, decision, the hearing was conducted under certain legal ground rules: the government was required to show that its evidence in this case was derived from sources independent of the testimony and documents compelled in Maryland under a grant of immunity, *see United States v. Kilroy*, 27 F.3d 679, 683 (D.C.Cir.1994), and the evidentiary burden on the government to establish an independent source was by a preponderance of the evidence, *see United States v. Montoya*, 45 F.3d 1286, 1292 (9th Cir.1995); *United States v. North*, 910 F.2d 843, 854, *opinion with-*

*drawn and superseded in part*, 920 F.2d 940 (D.C.Cir.1990) (en banc).

Subsequently, the Court informed the parties prior to trial that it would deny defendant's request to dismiss the indictment under *Hubbell* and *Kastigar*. The Court explained that, on the basis of the record created, there had not been the type of use of defendant's immunized production of documents that would require dismissal of the indictment in light of several factors: (1) the proper focus must be on the testimonial aspects of defendant's immunized production (for example, the existence and location of the documents produced) rather than on the contents of the documents; (2) the relevant issue is the direct or derivative use by the government of the immunized testimony or conduct, not the mere exposure of prosecutors or agents to immunized material; (3) the existence of legitimate and wholly independent sources for the evidence the government relied on in obtaining the search warrants of defendant's business and residence and in obtaining the indictment; (4) the absence of any use of immunized testimony or conduct in obtaining the indictment or the search warrants, or in preparing witnesses; (5) the inevitability of the discovery of certain disputed information by the government during the course of its investigation of defendant; and (6) the fact that any minimal direct or derivative use that might have occurred would be "harmless error beyond a reasonable doubt."

Following trial and his conviction, defendant has now renewed his motion to suppress evidence and dismiss the charges against him under *Kastigar* and *Hubbell*; alternatively, he requests a new trial pursuant to Fed.R.Crim.P. 33. This opinion provides a further explanation of the Court's decision denying defendant's original request to dismiss the indictment following the *Kastigar* hearing, and explains

the basis for denial of defendant's renewed motion for suppression of evidence and dismissal of charges or, alternatively, for a new trial.

## BACKGROUND

### I. *Facts and Proceedings*

The basic background of this matter is not in dispute. Defendant, a criminal defense attorney, had been representing Jerome Harris in a criminal proceeding in the District of Maryland. In the summer of 2000, defendant came under investigation by the United States Attorney's Office and the Drug Enforcement Administration for possible money laundering, contempt or obstruction of justice relating to defendant's receipt of a 1991 Mercedes Benz as a fee from Mr. Harris, and the failure of defendant to disclose that transfer to the District Court in the context of an assessment of Harris's assets for sentencing and forfeiture purposes.

In August 2000, a grand jury subpoena *duces tecum* was issued to defendant requiring the production of six categories of documents relating to

- the use, ownership, possession, custody or control of the 1991 Mercedes Benz;
- the payment of legal fees by Harris to defendant;
- any vehicles in Harris's custody (if defendant had access to them);
- Laura P. Pelzer (defendant's sister) or two other individuals who were on the title of the Mercedes;
- correspondence between defendant and the government in the underlying criminal case concerning Mr. Harris; and
- employees in defendant's law office.

When defendant asserted his Fifth Amendment privilege against self incrimi-

nation, an Order was issued by the District Court pursuant to 18 U.S.C. §§ 6002 and 6003 providing "act of production" immunity as to the subpoenaed documents, but expressly limited "only to the testimonial aspects of [defendant's] production of these items to the grand jury." Defendant's testimony to the grand jury on August 9, 2000, in connection with the production of responsive documents was narrow and entailed only the assertion of his Fifth Amendment privilege, a review of the District Court's immunity order, and review of the approximately 300 pages of documents produced. Among the documents produced were some of relevance to the tax evasion and fraud charges in this case, including documents relating to a Georgia rental property showing joint ownership by defendant and his sister; documents relating to the Mercedes showing it registered to defendant's sister; documents relating to a Citibank account held jointly with his sister; documents relating to a Porsche demonstrating it was registered to his sister; documents showing the use of money orders by defendant to pay for parts and service on the Mercedes and Porsche; documents relating to other usage of money orders by defendant; and documents identifying Maggie Alexander as defendant's legal secretary.

Thereafter, the United States Attorney in Maryland requested defendant's tax records from the IRS through an *ex parte* application for a judicial order. In seeking the immunity order from the District Court, the prosecutors represented that they would obtain defendant's tax records from the IRS through an *ex parte* order. The prosecutors had earlier included a provision for business and personal tax returns in the draft grand jury subpoena, but deleted that item after defendant indicated he would impose a Fifth Amendment

objection. When the IRS responded to the *ex parte* order for defendant's tax records with information that defendant had not filed tax returns for 1996 and 1997, the prosecutors in Maryland recognized that defendant might have committed tax offenses, which would have to be prosecuted in the District of Columbia.

In late 2000, the tax investigation matter was referred to the United States Attorney in the District of Columbia, and the IRS commenced an investigation, which was formally opened by the IRS as a tax investigation in March 2001. Affidavits in support of search warrants for defendant's residence and business were prepared by IRS agents in early 2001. The review and approval process required for the search of an attorney's office took considerable time. The government concedes that, to a limited extent, the IRS made use of some documents that defendant had produced to the grand jury to support the search warrant affidavits, but contends that no use was made of any evidence relating to defendant's "act of production" of any documents. The government has also conceded, and the record reflects, that there was an awareness of the implications of *Hubbell* and *Kastigar* in this setting, and that the affidavits were modified, based in part on information from defendant's documents, because of concerns raised by IRS Counsel before the searches were finally conducted on June 26, 2001.

Two boxes of materials were seized from defendant's apartment residence, and four boxes of materials were seized from his office. When the IRS learned from a review of financial records that defendant had engaged the services of a tax preparer, a subpoena was issued to the tax preparer and two additional boxes of financial materials were obtained. Subsequently, the government also issued subpoenas to several financial institutions to obtain addi-

tional financial records relating to accounts that defendant and/or his sister had maintained.

Beyond question, the primary materials thereafter utilized by the government in its investigation and prosecution were these materials relating to defendant's financial affairs that were obtained as a result of the search of his residence and office, as well as materials from the IRS and from the financial institutions, and not any documents or information provided by defendant to the Maryland grand jury in early August 2000. The indictment of defendant for tax evasion and fraud was returned on December 10, 2002. The government has established that no document obtained from defendant through the Maryland grand jury was shown to the District of Columbia grand jury which returned the indictment in this case. In addition, the record establishes beyond peradventure that no document obtained from defendant through the Maryland grand jury was used in the trial of this case. However, the Court concluded that a *Kastigar* hearing was warranted because the documents produced under "act of production" immunity to the Maryland grand jury were known to IRS agents and prosecutors involved in this case, the government was aware during its investigation that a *Kastigar/Hubbell* issue was looming, and it was not a demonstrably "foregone conclusion" that all the documents produced by defendant under immunity existed and were in his possession, and in light of some uncertainty regarding the use of information obtained from defendant under immunity, or any leads derived therefrom, to obtain subsequent search warrants or the indictment in this case. The record of that two-day evidentiary hearing, together with the trial record, constitutes the factual underpinning of defendant's claim and the government's response.

## II. *Legal Framework*

■ The basic framework for analysis of defendant's claims is provided by the Supreme Court's decisions in *Kastigar* and *Hubbell*. The question presented in *Kastigar* was

whether the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony.

406 U.S. at 442, 92 S.Ct. 1653. The Court assessed 18 U.S.C. § 6002 and concluded as follows:

The statute's explicit proscription of the use in any criminal case of "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)" is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege.

*Id.* at 453, 92 S.Ct. 1653. The Court observed that the Fifth Amendment privilege does not insulate one from prosecution, but only from being forced to give testimony leading to criminal prosecution, and therefore immunity from the use of compelled testimony and any evidence derived therefrom affords the necessary constitutional protection. *Id.; see also id.* at 458, 92 S.Ct. 1653 (prior cases "compel the conclusion that use and derivative-use immunity is constitutionally sufficient to compel testimony over a claim of the privilege"). Because both the Fifth Amendment and § 6002 permit the government to prose-

cute based on evidence from independent sources, immunity under § 6002 "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity therefore is coextensive with the privilege and suffices to supplant it." *Id.* at 462, 92 S.Ct. 1653.

Almost thirty years after the decision in *Kastigar*, the Court addressed in *Hubbell* (1) whether the Fifth Amendment privilege protects a witness from being compelled to disclose the existence of incriminating documents that the Government is unable to describe with reasonable particularity; and (2) if the witness produces such documents pursuant to a grant of immunity, whether 18 U.S.C. § 6002 prevents the Government from using them to prepare criminal charges against him.

530 U.S. at 29–30, 120 S.Ct. 2037. As part of the Whitewater Independent Counsel investigation, Hubbell, who had earlier pled guilty to other charges, produced over 13,000 pages of documents in response to a subpoena and an order under 18 U.S.C. §§ 6002, 6003(a) granting immunity "to the extent allowed by law"; the documents produced provided the prosecutors with information resulting in a second prosecution. *Id.* at 31, 120 S.Ct. 2037.

■ The *Hubbell* Court noted that one could be compelled to produce specific documents even if they contain incriminating statements because the creation of those documents was not compelled, and thus "Hubbell could not avoid compliance with the subpoena served on him merely because the demanded documents contained incriminating evidence, whether written by others or voluntarily prepared by himself." *Id.* at 36, 120 S.Ct. 2037 (citing *Fisher v. United States*, 425 U.S. 391, 409–10, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)). However, the Court also observed "that 'the act

of production' itself may implicitly communicate 'statements of fact'" and thus may have a compelled testimonial aspect. *Id.* at 36, 120 S.Ct. 2037. Frequently, the individual producing the documents may be forced to become a witness who must answer questions about whether everything sought by the subpoena has been produced.

> The answers to those questions, as well as the act of production itself, may certainly communicate information about the existence, custody, and authenticity of the documents. Whether the constitutional privilege protects the answers to such questions, or protects the act of production itself, is a question that is distinct from the question whether the unprotected contents of the documents themselves are incriminating.

*Id.* at 37, 120 S.Ct. 2037. Moreover, the compass of Fifth Amendment protection extends to compelled information that leads to the discovery of incriminating evidence even if the information itself is not incriminating. *Id.* at 37–38, 120 S.Ct. 2037 (citing *Doe v. United States,* 487 U.S. 201, 208 n. 6, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988)).

The *Hubbell* Court noted that *Kastigar* had confirmed the protection under § 6002 against derivative use of compelled testimony, and "particularly emphasized the critical importance of protection against a future prosecution ' "based on knowledge and sources of information obtained from the compelled testimony." ' " *Id.* at 39, 120 S.Ct. 2037 (quoting *Kastigar,* 406 U.S. at 454, 92 S.Ct. 1653, and *Ullmann v. United States,* 350 U.S. 422, 437, 76 S.Ct. 497, 100 L.Ed. 511 (1956)). Given the broad statutory safeguard under § 6002 against any direct or indirect use of compelled testimony or information derived from it, the government has the burden

not merely to show that its evidence is not tainted by the prior testimony, but "to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."

*Id.* at 40, 120 S.Ct. 2037 (quoting *Kastigar,* 406 U.S. at 460, 92 S.Ct. 1653). As is the case here, the Court in *Hubbell* noted that "[t]he 'compelled testimony' that is relevant in this case is not to be found in the contents of the documents produced in response to the subpoena. It is, rather, the testimony inherent in the act of producing those documents." 530 U.S. at 40, 120 S.Ct. 2037. In *Hubbell,* the Court concluded that the government had, in fact, made derivative use of the testimonial aspect of Hubbell's act of production in obtaining the indictment and preparing the case for trial. *Id.* at 41, 120 S.Ct. 2037. That use was described as Hubbell's assistance in identifying, assembling, cataloging and producing sources of information (because Hubbell must have made extensive use of the knowledge in his mind in doing so). *Id.* at 41–43, 120 S.Ct. 2037. The Court thereby rejected the government's overly-narrow view that the production of documents by Hubbell was nontestimonial and separate "from its 'implicit' testimonial aspect so as to constitute a 'legitimate, wholly independent source' (as required by *Kastigar*) for the documents produced." *Id.* at 43, 120 S.Ct. 2037.

Thus, a constitutional privilege extends "to the testimonial aspect of a response to a subpoena seeking discovery" of the sources of potentially incriminating evidence just as it does to compelling a witness to answer questions intended to obtain information about those sources. *Id.* Importantly, the Court noted, although

> in *Fisher* the Government already knew that the documents were in the attorneys' possession and could independent-

ly confirm their existence and authenticity through the accountants who created them, here the Government has not shown that it had any prior knowledge of either the existence or the whereabouts of the 13,120 pages of documents ultimately produced by [Hubbell].

*Id.* at 44–45, 120 S.Ct. 2037. The Court rejected the government's broad argument that businessmen like Hubbell will always possess financial and tax records within vague subpoena categories, therefore finding that *Fisher*'s "foregone conclusion" doctrine did not apply. *Id.* The Court concluded that Hubbell's act of production had a testimonial aspect and thus he could only be compelled to produce the requested documents under a grant of immunity, and that

*Kastigar* requires that respondent's motion to dismiss the indictment on immunity grounds be granted unless the Government proves that the evidence it used in obtaining the indictment and proposed to use at trial was derived from legitimate sources "wholly independent" of the testimonial aspect of respondent's immunized conduct in assembling and producing the documents described in the subpoena.

*Id.* at 45, 120 S.Ct. 2037.

## III. *Defendant's Contentions*

As cast broadly in his original motion, defendant's contention is that the government utilized information obtained from him under a grant of immunity, as well as leads derived from that immunized information, to obtain the charges brought against him in this case. He asserts that the government's evidence at trial was developed through the search warrants of his residence and office that were the product of the documents and testimony obtained under an immunized act of production, and that the government has not proven that the case against him was not derived, di-

rectly or indirectly, from his testimony and documents produced under the grant of immunity. He contends, therefore, that the denial of his *Kastigar* motion should be reconsidered and reversed, most of the government's evidence at trial should be suppressed, and the indictment and information should both be dismissed, or that, alternatively, he should now be granted a new trial.

Neither *Hubbell* nor *Kastigar* will support the unconstrained approach to these issues that defendant urges, and certainly the methodical investigative and prosecutorial effort of the government here refutes defendant's expansive argument. As refined through the evidentiary record and the parties' numerous memoranda, defendant's challenge boils down to the alleged use, or derivative use, of the contents of documents (or authenticating testimony) in five areas: (1) financial records from Citibank, Dreyfuss and Fidelity; (2) the relationship between defendant and his sister in financial settings involving the Georgia property; (3) the identity of Maggie Alexander as an employee of defendant; (4) the utilization of money orders and cashiers checks by defendant (his "cash lifestyle"); and (5) the placement of the Mercedes in his sister's name as a nominee. The primary derivative use pressed by defendant involves Maggie Alexander, whose name was obtained through the Maryland grand jury procedure, including the use of defendant's documents in the course of her grand jury examination and the use of her during the investigation as a map to defendant's office.

## ANALYSIS

In ordering an evidentiary hearing under *Kastigar*, this Court noted that "it may well be that defendant's act of production of [the] documents contained implicit

testimonial representations or acknowledgments previously unknown to the government at the time of the production," and therefore concluded that an evidentiary hearing was required to determine whether that was the case and, if so, whether "the government can meet its burden of establishing that it did not use the information provided by defendant under a grant of immunity in indicting and prosecuting this case." Mem. Op. (June 3, 2003) at 8. The evidentiary hearing thereafter conducted, the submissions of the parties, and now the subsequent trial have collectively confirmed, however, that no improper use of testimonial aspects of defendant's immunized production of documents occurred such that dismissal of the indictment or a new trial is warranted.

## I. *Additional Legal Principles*

■■■ *Kastigar* and *Hubbell* set the stage for analysis of defendant's motion. *Kastigar* established that immunity from use or derivative use of testimony compelled under a § 6002 court order is coextensive with the Fifth Amendment privilege against self-incrimination, and therefore sufficient to compel testimony over a claim of the privilege. *See* 406 U.S. at 453, 462, 92 S.Ct. 1653. Refining *Kastigar* in the setting relevant here, *Hubbell* noted that the "act of production" may have a testimonial aspect distinct from the contents of the documents produced, *see* 530 U.S. at 36–37, 120 S.Ct. 2037, and that in light of the broad statutory safeguard under § 6002 against any direct or indirect use of compelled testimony or information derived from it, it is the government's burden to show both that its evidence is not tainted by the prior immunized information and that the evidence it will use is derived from an independent, legitimate source, *id.* at 40, 120 S.Ct. 2037. The Court in *Hubbell*, therefore, looked to the testimony inherent in the act of producing

documents, not to the contents of the documents themselves, for the relevant "compelled testimony," and concluded that the government had made an improper derivative use of the testimonial aspect of Hubbell's act of production, specifically his use of his knowledge to identify, assemble, catalogue and produce sources of information. *Id.* at 41–43, 120 S.Ct. 2037. Distinguishing *Fisher*, where the government already knew that the requested documents were possessed and "could independently confirm their existence and authenticity," the Court concluded that the government could not establish "any prior knowledge of either the existence or the whereabouts" of the thousands of pages of documents produced by Hubbell. *Id.* at 44–45. *Hubbell*, therefore, draws a sharp distinction between "the testimonial aspect of . . . immunized conduct in assembling and producing the documents," *id.* at 45, 120 S.Ct. 2037, and the contents of the documents, *id.* at 40, 120 S.Ct. 2037.

The timing and conduct of a *Kastigar* hearing is largely within the discretion of the trial court. Although a pre-trial hearing is perhaps most common, post-trial and even mid-trial submissions and proceedings are also frequently employed. *See North*, 910 F.2d at 854; *United States v. Cantu*, 185 F.3d 298, 304 (5th Cir.1999). Indeed, the Second Circuit generally favors holding post-trial hearings. *See United States v. Volpe*, 42 F.Supp.2d 204, 219–20 (E.D.N.Y.1999) (collecting cases in Second Circuit). Affidavits may be accepted in lieu of or in addition to live testimony, and thus a hearing may not be required if no factual issues demand resolution. *See United States v. Dudden*, 65 F.3d 1461, 1469 (9th Cir.1995); *United States v. Montoya*, 45 F.3d 1286, 1292 (9th Cir.1995); *North*, 910 F.2d at 917 (dissent). Here, the Court opted for a pre-trial *Kastigar* evidentiary hearing, in-

cluding testimony, affidavits and *in camera* grand jury materials, which has now been supplemented by the trial itself and by post-trial submissions.

*Hubbell* recognizes that it is the government's burden "not merely to show that its evidence is not tainted by the prior testimony, but 'to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.'" 530 U.S. at 40, 120 S.Ct. 2037 (quoting *Kastigar,* 406 U.S. at 460, 92 S.Ct. 1653). That burden is heavy "because of the constitutional standard: the government has to meet its proof only by a preponderance of the evidence, but any failure to meet that standard must result in exclusion of the testimony." *North,* 910 F.2d at 873. The burden is not insurmountable, however, for "[t]he government need not show that the prosecution team had no exposure to the immunized testimony at all," and even evidence obtained following exposure to immunized testimony may establish an "independent source" for the information. *United States v. Nanni,* 59 F.3d 1425, 1432 (2d Cir.), *cert. denied,* 516 U.S. 1014, 116 S.Ct. 576, 133 L.Ed.2d 499 (1995). If pursuit of an investigation or specific information may have been "motivated by both tainted and independent factors," the determination must be made whether the government would have followed the same investigative steps without the motivation supplied by the immunized information. *Id.* at 1432; *accord United States v. Biaggi,* 909 F.2d 662, 689 (2d Cir.1990). Importantly, in addition to such independent source considerations, "[d]ismissal of the indictment or vacation of the conviction is not necessary where the use is found to be harmless beyond a reasonable doubt." *North,* 910 F.2d at 854 (citations omitted).

■ Plainly, it is the use of the immunized information that is crucial, not whether the prosecutors or agents were exposed to or aware of the contents of the immunized information. *See, e.g., Montoya,* 45 F.3d at 1292–93; *United States v. McGuire,* 45 F.3d 1177, 1183–84 (8th Cir. 1995); *United States v. Velasco,* 953 F.2d 1467, 1474 (7th Cir.1992); *United States v. Caporale,* 806 F.2d 1487, 1518–19 (11th Cir.1986). Even a prosecutor's good faith in handling immunized testimony is not determinative; rather, it is simply the use of the immunized information that matters. Indeed, the same prosecutor and the same grand jury that received the immunized testimony can participate in a subsequent indictment without any *Kastigar* violation. *See McGuire,* 45 F.3d at 1182–84.[2] The Court therefore disagrees with defendant's position that "knowledge is use," although it may be that in some circumstances detailed examination of immunized material would make it hard for the government to show its evidence was derived from an independent source. *See United States v. Hubbell,* 167 F.3d 552, 583 (D.C.Cir.1999). The task in any case remains, however, to determine whether the government has established that its evidence is not tainted by immunized information and instead is derived from a legitimate, independent source. *See Hubbell,* 530 U.S. at 40, 120 S.Ct. 2037 (quoting *Kastigar,* 406 U.S. at 460, 92 S.Ct. 1653).

■ Of critical importance here is whether the scope of § 6002 immunity extends to the contents of the produced documents, or is instead limited to the act of production. As *Hubbell* noted, these are distinct issues, *see* 530 U.S. at 37, 120 S.Ct. 2037, and it was solely the latter ("the testimonial aspect of respondent's immu-

---

**2.** In *McGuire,* the Eighth Circuit limited, based on its unusual circumstances, *United*

*States v. McDaniel,* 482 F.2d 305 (8th Cir. 1973), a case relied upon by defendant.

nized conduct in assembling and producing the documents") that was at issue there. *Id.* at 45, 120 S.Ct. 2037. So, too, here, where the starting point is the immunity order issued by the District Court in Maryland pursuant to 18 U.S.C. §§ 6002–6003, which plainly provided only act of production immunity in light of its express limitation "only to the testimonial aspects of [defendant's] production ... to the grand jury." Hence, although defendant seeks to focus on the information the documents conveyed on matters such as joint ownership of assets, cash lifestyle, or the employment of Maggie Alexander—*i.e.,* the contents of the documents—the proper focus must instead be on the testimonial aspects of defendant's production of such documents. Under *Hubbell* and *Fisher,* the operative concept is "testimony inherent in the act of production," which is plainly *not* the contents of the documents produced. *Fisher* established generally that the Fifth Amendment does not protect the contents of documents themselves. *See* 425 U.S. at 408, 96 S.Ct. 1569; *accord, United States v. Doe,* 465 U.S. 605, 613, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (contents of business records not protected by the Fifth Amendment; act of production protected under *Fisher* ). As extracted from *Fisher, Hubbell* confirmed the "settled proposition that a person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled' within the meaning of the privilege." 530 U.S. at 35–36, 120 S.Ct. 2037.

■ The immunity order here thus extends only to the testimonial aspects of the production of documents, not to the contents of the documents produced. *Fisher* noted that although the Fifth Amendment did not protect the contents of documents, "[t]he act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced." 425 U.S. at 410, 96 S.Ct. 1569. No testimonial concerns were found in *Fisher,* but the respondent in *Hubbell* was required to interpret a broad subpoena and assemble, catalogue and produce responsive materials. Whereas *Fisher* recognizes "testimony inherent in the act of production"—the tacit admission of the existence, location, possession, and authenticity of documents not known to the government or as to which the defendant's possession is not a "foregone conclusion"—*Hubbell* adds the category of mental statements revealed by a witness's interpretation and response to a broad subpoena through the assembly and production of documents. It is these testimonial aspects of the act of production that are at issue here, not the substantive contents of the produced documents.[3]

Lastly, and as defendant conceded during the proceedings on his motion, a "harmless beyond a reasonable doubt" standard applies to the Fifth Amendment issue here. *See, e.g., United States v. Poindexter,* 951 F.2d 369, 377 (D.C.Cir.1991); *North,* 910 F.2d at 854; *Nanni,* 59 F.3d at 1444. Hence, defendant's motion should be denied, even if immunized information was used in charging or convicting defendant, if the use is nonetheless found to be harmless beyond a reasonable doubt—for example, if probable cause plainly existed for search warrants even absent the use of any immunized information.

---

**3.** In light of the Supreme Court's teaching in *Hubbell, Fisher,* and *Doe,* the Court rejects defendant's strained reading of the D.C. Circuit opinion in *Hubbell* and the decision in *In re Sealed Case,* 791 F.2d 179 (D.C.Cir.1986), that statutory immunity under § 6002 routinely extends to the contents of documents.

## II. *General Assessment*

In the *Kastigar* hearing, the Court heard the testimony of IRS Agent Becker and Assistant United States Attorney Sandy Wilkinson (Maryland), and received proffered testimony from Assistant United States Attorney Mark Dubester (D.C.). The Court found all three to be candid, credible and truthful, and hence credits their testimony. That testimony, together with the background information and materials supplied by both sides, and ultimately the trial itself, provides the basis for the Court's conclusions.

There is no question here that the principal IRS agent and the D.C. prosecutor were aware of the contents and even some of the immunized testimony implicit in defendant's act of production of documents. Likewise, once exposed to such information, they could not readily, even with good faith efforts, wipe that awareness from their minds as they proceeded with the investigation in this case. But exposure to immunized information is not the test—it is the use of such information that matters. It is just as clear that the documents defendant produced, and any testimony implicit in his act of production, were not communicated to witnesses, used as the basis for additional subpoenas or search warrants, or employed at trial. This case is fundamentally different from *Hubbell* because, unlike the broad subpoena that constituted a fishing expedition there, the subpoena to defendant was narrow and specific, and reflected that the government already knew of the existence of the types of documents sought and their possession by defendant. Indeed, if defendant is right that this subpoena is a fishing expedition like that in *Hubbell*, it is hard to imagine a subpoena issued under § 6002 that would not be. The degree of interpretation, locating, cataloging and assembling of documents so important in *Hubbell* was simply not demanded by the narrow subpoena at issue here. And the fact that the government was aware of its responsibilities in light of *Hubbell*, and attempted to act with care, should not logically be held against the government when assessing whether, based on the record, immunized information actually was improperly used.

■ Here, there was no meaningful use of immunized information in obtaining the *ex parte* order for tax records from the IRS, the search warrants for defendant's residence and office, the subpoenas to financial institutions or, ultimately, the indictment and conviction of defendant. Moreover, it was inevitable that the government would discover during the course of its tax investigation through independent sources, as it in fact did, the information inherent in the production of documents by defendant. And to the extent that there was any minimal direct or derivative use of immunized documents (or the act of production), it was certainly harmless beyond a reasonable doubt. Indeed, because there was at most only a minimal, and mainly derivative, use of immunized information, a reasonable remedy in any event would be to suppress the use of, for example, the money orders defendant produced to the grand jury or the testimony of Maggie Alexander—which is effectively what has happened already because neither Maggie Alexander nor any of defendant's documents were used by the government at trial.

## III. *Specific Claims*

The issues here can be analyzed by looking either at the subject matters in defendant's documents that are asserted to be the root of the *Hubbell* problem, or by considering the alleged improper uses of such information. It is helpful to consider both strains of analysis, beginning with an

examination of the five subject matters on which defendant has focused as the core of the alleged use, or derivative use, of immunized information. In doing so, of course, this Court remains mindful of the principle that the act of production, not the contents of the documents, is the heart of the matter.

## A. Areas of Immunized Information

### 1. *Mercedes Ownership*

Defendant contends that the government made improper use of information from the documents produced to the grand jury that revealed that the Mercedes automobile was registered in the name of Laura Ponds Pelzer, defendant's sister. Defendant's argument seems to be that even if the government knew independently that the Mercedes was registered in her name, the documents produced to the grand jury also revealed that it was as a nominee and therefore a sham. Defendant believes this latter information was revealed by defendant's act of production—*i.e.*, his possession and production of the documents relating to ownership of the Mercedes.[4]

To begin with, defendant's argument in reality rests on the contents of the documents, not the act of production. There is nothing about the gathering or production of material in response to a subpoena seeking specific documents relating to the ownership or control of the Mercedes—the testimonial aspects of that act of production—that would constitute a revelation that the Mercedes was registered to Laura Ponds Pelzer as a nominee. That information comes from the contents of the docu-

ments, not from the act of producing them to the grand jury.

Moreover, the evidence establishes that the government had independent sources—from Mr. Harris, from Mr. Kelly (the resident agent at defendant's apartment), and from the observations of government agents—for the facts that the Mercedes was a fee from Mr. Harris in defendant's possession and control but registered to his sister. Those independently obtained facts certainly give rise to a suspicion that the vehicle was registered to Laura Ponds Pelzer as a nominee, which is the same inference that arises from the contents of the documents defendant produced (or from the act of production).

Finally, the record reflects no use by the government of this information to procure search warrants or the indictment in this case. Hence, even beyond the fact that defendant improperly focuses on contents rather than the testimonial aspects of the act of production, the combination of independent sources and an absence of evidence of improper use by the government is fatal to defendant's claim. *See Hubbell*, 530 U.S. at 40, 120 S.Ct. 2037.

### 2. *Georgia Property Ownership*

Defendant's contentions with respect to ownership of the Georgia property are similarly flawed. Ms. Becker, the principal IRS agent, did not possess that information prior to obtaining the search warrants for defendant's residence and office, and thus the Georgia property was not mentioned in the search warrant affidavit or otherwise used in obtaining the search

---

**4.** Any similar claim of a Fifth Amendment violation relating to the ownership of the Porsche is unavailing because of an independent source for the information. The evidence is that the Porsche was seen by government representatives in defendant's driveway prior to issuance of the grand jury subpoena to him; that the government had already confirmed that the "I Object" license plates on that vehicle were registered to Laura Ponds Pelzer in Pennsylvania; and that, thereafter, the government confirmed that the vehicle had been transferred by defendant to his sister several years earlier.

warrants. Of course, once the government received returns on those search warrants, it obtained the information concerning the relationship between defendant and his sister regarding the Georgia property from an independent source. Moreover, the same information was independently acquired from the IRS through the IRP data and other material obtained by *ex parte* order, again without reliance on any tainted documents or information.

### 3. *Financial Institution Records*

Some documents produced by defendant to the grand jury related to accounts with Citibank, Fidelity and Dreyfuss, including information regarding the financial relationship of defendant and his sister on the Citibank account. There is no dispute that the prosecutor in D.C. received from the prosecutor in Maryland at least some information relating to these accounts drawn from the documents defendant produced to the grand jury. Defendant contends that the knowledge and use of this information violated his Fifth Amendment rights.

Again, however, defendant's focus inevitably is on the contents of documents produced, not the act of production. Defendant can point to no testimonial aspect of the act of production of these materials that was used by the government to obtain subsequent search warrants or subpoenas or, ultimately, the indictment of defendant. Moreover, the government obtained the same basic information regarding these financial accounts both from IRP data furnished by the IRS under *ex parte* order and from defendant's tax preparer under a grand jury subpoena. Neither of those sources was, the Court concludes, tainted in any way. Indeed, Agent Becker testi-

fied that she became aware of these accounts from the IRP data, not from defendant's documents. The Court therefore concludes that there were independent, untainted sources for this same financial information. Finally, subpoenas were later issued to Citibank to obtain the records related to that account, which again served as an independent source for the information ultimately used by the government.[5]

### 4. *Cash Lifestyle*

Certain money orders and other documents produced by defendant to the grand jury reflected a "cash lifestyle" that was of significance in the government's tax investigation. Here too, however, defendant cannot sustain his Fifth Amendment claim given the record evidence.

First, there is no persuasive challenge made by defendant based on the act of production as opposed to the contents of such materials. On the other hand, defendant is somewhat persuasive that the government's attempt to show a cash lifestyle based on information from Mr. Kelly relating to late rent payments by cashier's check or money order is misplaced given the lease requirement that late payments be made in that manner. But the government has produced persuasive evidence from the D.C. prosecutor that a factor heavily influencing the belief that defendant had a cash lifestyle was independent information from credit reports showing virtually no credit activity. That independent source is enough to defeat defendant's claim. The combination of the absence of any testimonial aspect of the act of production together with an independent source for the information is enough to establish that no Fifth Amendment vio-

---

**5.** The search warrants and supporting affidavit relating to defendant's residence and office do not mention any of these accounts. The indictment mentions the Citibank account, but not Dreyfuss or Fidelity; indeed, the government has never asserted that the Fidelity account involved any criminal conduct.

lation occurred relating to money orders or other indicia of a cash lifestyle.

### 5. *Maggie Alexander*

Perhaps the most serious of defendant's contentions relates to alleged improper direct or derivative use of information relating to Maggie Alexander, an employee in defendant's law office. There are three arguments that defendant pursues. First, he contends that the government initially became aware of Maggie Alexander through the inclusion of her name in a document produced by defendant under immunity. Second, defendant challenges the use of her identity and all that flowed from it in the development and approval of search warrants for defendant's residence and office. Third, defendant contends that the later use of her Maryland grand jury testimony, which included examination on some documents produced by defendant, in the District of Columbia grand jury was an impermissible derivative use of immunized material. Each of these contentions will be examined in turn.

a. For several reasons, the revelation of Maggie Alexander's identity through a health care form produced by defendant to the grand jury does not lead to a violation of his Fifth Amendment rights. To begin with, it was a "foregone conclusion" that defendant would possess documents identifying someone who worked for him in his law practice. Although defendant argues that the government only knew that he was a sole practitioner, not that he was an employer, the Court concludes that it was a foregone conclusion in this day and age in the Washington area that a sole practitioner would have some staff, even if part-time or temporary, to assist him in his legal practice. Moreover, it was also a foregone conclusion that certain administrative documents, including health care forms, would exist with respect to such staff, and would be in defendant's possession. It does not really matter whether the person was an employee or someone else assisting with paperwork for the sole practitioner—it was a foregone conclusion that there would be someone and that there would be documents reflecting that person's existence and identity. Although continuing to insist otherwise, defendant conceded in argument at the *Kastigar* hearing that this is not his strongest point.

It is also true that any use of the identity of Maggie Alexander was a use of the content of the document produced, not of defendant's act of production. Defendant's position is that if the government knows there are employees, and receives immunized documents reflecting their names, but then talks to those employees without using the documents or having them authenticated, that constitutes an impermissible derivative use unless the government can demonstrate that it acquired the identity of the employees independently. The Court disagrees. In effect, this argument would eliminate any distinction between content and act of production, a result squarely at odds with the careful differentiation explained in *Hubbell*. *See* 530 U.S. at 37, 120 S.Ct. 2037. There was no need here for the government to rely on defendant's act of producing the health care form, as it was solely the content (Maggie Alexander's identity) that was useful as the government pursued its investigation, not defendant's authentication or the location of the document. Indeed, the specific document was totally irrelevant to the government, and was never used in any way.

Equally important, the government had adequate independent sources for the identity of Maggie Alexander. Agent Becker testified that she located Maggie Alexander in order to summon her to the grand jury by accessing the IRS data base that was acquired independent of defendant's

production of documents to the grand jury. Checks and other materials including Maggie Alexander's name, social security number and a reference to "secretarial services" were also obtained from the records of defendant's tax preparer, which were subpoenaed without any reliance on documents defendant produced to the grand jury. Bank records of defendant that the government obtained by subpoena also included checks payable to and endorsed by Ms. Alexander. Moreover, if the search warrants for defendant's residence and office are valid because the reference to Maggie Alexander (or any other use of defendant's documents) is harmless beyond a reasonable doubt, then Maggie Alexander's identity was also obtained through the untainted independent source of the search warrants. If the government would have executed the search warrants even without the information obtained from Maggie Alexander, and would have discovered Maggie Alexander's identity as a result of those search warrants, then the government is in the same place it would have been in any way.

Hence, although Ms. Alexander's identity and address were first obtained through the Maryland investigation, the subsequent tax investigation developed the same information through IRS records, bank records, and other independent sources that inevitably would have been thoroughly explored even without defendant's initial identification of Maggie Alexander through the health care form he produced to the grand jury. Because the identity of Maggie Alexander has several untainted independent sources, excluding that challenged evidence (her identity and what flowed from it) is unwarranted because it would put the government in a worse position than it would have been in without the alleged violation.

**b.** For similar reasons, the Court concludes that the use of Maggie Alexander's identity, as well as information flowing from it, in obtaining search warrants for defendant's residence and office did not violate *Kastigar* and *Hubbell*. Unlike the situation in *Hubbell*, the government could make its case for the search warrants here without establishing that the health care form identifying Maggie Alexander came from defendant's documents—there was no issue of location, authenticity and production invoking consideration of defendant's act of production. The document had no significance beyond its content (her name), and the government did not need to show location, authenticity or possession by defendant in order to establish probable cause for the search warrants.

It is true, nonetheless, that reference to Maggie Alexander is made in the search warrant affidavit. But the reference to office procedures (which raises defendant's contention that she became a map to his office) related to testimony by Ms. Alexander in the Maryland grand jury that for the most part did not involve questions based on documents defendant had produced. And the reference to Ms. Alexander's statements regarding defendant's use of money orders again relates to the contents of materials, not to defendant's act of production. Moreover, as explained above, the government had independent information indicating that defendant was living a cash lifestyle, including credit reports showing little credit activity and information from the resident manager of defendant's apartment. Finally, any modification to the draft search warrant affidavit because of concerns of the IRS Counsel was based on information entirely independent of Maggie Alexander's identity and subsequent testimony. Indeed, the IRS concern with the search warrants related to defendant's residence, while Maggie Alexander's Maryland grand jury testimony went primarily to issues concerning defendant's business or office.

Ultimately, defendant's argument is that Ms. Alexander's Maryland grand jury testimony was replete with the use of documents produced by defendant and was the lynch-pin for approval of the search warrants. But the use of Maggie Alexander independently to authenticate documents produced by defendant seems appropriate, not unconstitutional, as designed to avoid any improper use of defendant's act of production to authenticate those documents. Taking documents produced to the grand jury under act of production immunity and showing them to another witness in the grand jury in order to get that witness independently to authenticate and explain the location and existence of those documents is appropriate under *Kastigar* and *Hubbell.*

**c.** The Court concludes as well that the use of Maggie Alexander's Maryland grand jury testimony in her District of Columbia grand jury examination did not violate defendant's Fifth Amendment rights. It does not appear that any aspect of her District of Columbia examination was influenced by her testimony in Maryland. The topics on which she was examined in the District of Columbia did not relate to the topics on which she was examined in Maryland based on documents produced by defendant—for example, she was not shown the money orders relating to service on the Mercedes. When Agent Becker pulled documents for the examination of Maggie Alexander in the District of Columbia grand jury, she pulled them from files that did not include defendant's documents, which were used only to examine Maggie Alexander in the Maryland grand jury.

**B. Uses of Immunized Information**

**1. *IRS Ex Parte Order***

Subsequent to the grand jury subpoena of defendant's documents, the United States Attorney in Maryland obtained an *ex parte* order for defendant's tax records from the IRS. It is clear, however, that this request was not generated by defendant's production of documents to the grand jury, inasmuch as the prosecutors had earlier included a provision for business and personal tax returns in the draft grand jury subpoena to defendant, but had deleted that item after defendant indicated he would impose a Fifth Amendment objection. From the IRS, the government learned that defendant had not filed tax returns in some years, which spurred the tax investigation in the District of Columbia, and also received certain records (including IRP data) thereafter used in the course of that investigation. The IRS tax records fall into the category of an independent, untainted source, because the government has established that its effort to obtain this tax information relating to defendant was under way before, and independent of, defendant's act of production to the grand jury.

**2. *Search Warrants***

An important element of defendant's claim is his assertion that the search warrants of his residence and office were obtained based on immunized information from his production of documents to the Maryland grand jury. Although most of the documents produced by defendant to the grand jury were not used to obtain these search warrants, the record is clear (and the government acknowledges) that Maggie Alexander was identified and then made certain statements to the grand jury based on documents that defendant produced, particularly relating to general office procedures and defendant's use of money orders. Some of those statements were included in the search warrant affidavit.

However, defendant still cannot point to any testimonial aspect of defendant's act of production—as opposed to the contents of the documents themselves—that was used by the government to obtain the search warrants. Certainly the government made use through Maggie Alexander of the contents of some of the documents, but it remains equally clear that the government did not rely on any testimonial inferences inherent in defendant's act of production in locating Ms. Alexander, examining her in the grand jury, or utilizing that testimony to support search warrants for defendant's residence and business. Moreover, it was a foregone conclusion that the documents and information at issue in defendant's production to the grand jury (*e.g.*, a health care form containing an employee's name) were the type of routine records that would exist and be in defendant's possession. Under *Kastigar* and *Hubbell*, then, there is no Fifth Amendment violation.

Mr. Dubester, the D.C. prosecutor, attempted to keep defendant's documents from IRS Agent Becker, who, in preparing the search warrant affidavit, had very limited access to the documents defendant had produced to the grand jury. In reviewing the draft search warrants and affidavit, however, IRS Counsel was examining materials that were in part derived from the documents defendant had produced to the grand jury. But it is not at all apparent how such conduct involved or implicated the testimonial aspects of defendant's act of production. Although the grand jury testimony of Maggie Alexander certainly included review of several documents produced by defendant to the grand jury, it was the contents of those documents that was examined. To the extent any material was used by Ms. Becker to prepare the search warrants or by IRS Counsel to review them, it was the contents of documents produced by defendant to the grand jury on which the government

relied, not any testimony inherent in the act of production.

But even if defendant's act of production were implicated, the government had ample independent sources for the same information. Agent Becker had obtained from IRS records, through the *ex parte* order, evidence of defendant's financial activities at his office, and had personally confirmed that defendant still occupied that office. It is certainly reasonable for the government to conclude that defendant would possess financial records relating to his legal practice, and that they would be located at his office, even absent any confirmation of those facts by Maggie Alexander, defendant's secretary. Likewise, based on the information available to the government from independent sources, it was reasonable to conclude that defendant would have personal financial documents located at his residence. Hence, even though Maggie Alexander provided information along these same lines, the government had independent sources to provide probable cause for the search warrants, which plainly existed even without her statements. There is no reasonable basis to doubt that the government would have pursued the search warrants for defendant's residence and office even without Maggie Alexander's testimony, or that probable cause existed based on independent sources of information. Finally, and in any event, the minimal use of information from Maggie Alexander that was derivative of defendant's production to the grand jury falls well within the doctrine of "harmless beyond a reasonable doubt," as explained below, and hence cannot be the basis for a finding that defendant's Fifth Amendment rights were violated.

### 3. *Additional Subpoenas*

Defendant also bases his claim on the assertion that the government received

subpoenaed documents from third parties that were somehow tainted by his grand jury production. The Court concludes, however, that those subpoenas were based on information obtained from independent sources and, to the extent any documents produced by defendant were used (the Citibank records), that use was so minor in the scheme of things as to be harmless beyond a reasonable doubt. Moreover, as with most of the other claims defendant asserts, his focus is much more on the use of the contents of documents he produced than on any testimonial aspects of his act of production. It is only the latter that is a proper basis for a Fifth Amendment claim here.

### 4. *The Indictment*

Finally, defendant's claim also rests on an alleged use of immunized information to obtain the indictment in the District of Columbia. There is no factual basis whatsoever to suggest that the referral of the matter by the Maryland prosecutors to the United States Attorney for the District of Columbia was somehow dependent on immunized material produced by Ponds. Given the clear evidence from independent sources that defendant, a well-known attorney, had not filed tax returns and had engaged in deceptive conduct concerning the receipt of an expensive automobile as a fee, there was little alternative but to refer the matter for investigation and possible prosecution in the District of Columbia. There is likewise no evidence that the indictment itself was based on immunized information. No evidence obtained from defendant or the documents he produced was used in the District of Columbia grand jury, nor was any testimony or inference associated with his act of producing those

documents the basis for the indictment. In the end, the investigation produced, from wholly independent sources, more than enough evidence to support the indictment of defendant.

### IV. *Government's Additional Arguments*

The government makes two additional arguments in opposition to defendant's claim of a Fifth Amendment violation. First, it contends that much of the information on which defendant bases his claim was voluntarily produced. Second, the government contends that any use that did occur here was minimal, and thus "harmless beyond a reasonable doubt." Although the second argument has some force, the Court is unable to rest its decision on the first contention.

### A. Voluntary Production

The government seeks to buttress its position that there was no Fifth Amendment violation through the contention that several items on which defendant relies to argue taint were beyond the scope of the grand jury subpoena and hence voluntarily produced by defendant. To the extent that the production was voluntary, defendant cannot logically or legally claim a Fifth Amendment violation because production was not compelled pursuant to a grant of immunity.

There is no doubt that defendant's attorney agreed to supply employee names outside the grand jury production, but then did not do so.[6] Instead, a single health care document containing the name of Maggie Alexander was produced in response to the subpoena specification for all documents relating to employees in defendant's law office. The government also

---

6. The government contends that it was of value to defendant to agree to provide the identity of Maggie Alexander outside the formal grand jury process, because she had been paid under the table by defendant.

contends that the production of Citibank, Fidelity and Dreyfuss account information, and documents relating to the Georgia property, was not within the scope of the subpoena as narrowed through discussions between the government and defendant. The contention is that there was an agreement to limit the subpoena specification for documents relating to Laura Ponds Pelzer, defendant's sister, only to documents concerning ownership of the Mercedes, and hence the production of documents relating to her involvement in joint financial accounts or the Georgia property was voluntary.

The problem is that this argument rests on an alleged agreement to narrow the scope of the subpoena as written and the immunity order as issued by the court, specifically as to the specifications dealing with documents relating to employees in defendant's law office and with Laura Ponds Pelzer. Certainly the government is correct that some reasonable modification to a court order and underlying subpoena, for example as to the date and time of production, must be available to parties. There is even some force to the proposition that defendant was not under "pains of contempt" for any failure to produce documents the government might have agreed he could refrain from producing (or could delay producing). But ultimately, this is primarily a factual issue, and the Court is unable to conclude that there was an unequivocal, "enforceable" narrowing of the subpoena, and hence of the *court's immunity order*, through verbal discussions by the parties unconfirmed in writing. It is a troublesome proposition to conclude that the scope of a judicial immunity order may be so materially modified without court involvement or even formal agreement.

In any event, because the other materials allegedly voluntarily produced by de-

fendant (the Georgia property and financial account records) were not used by the government to obtain search warrants or defendant's indictment, or had independent, untainted sources such as the IRP data from the IRS, this issue is most important as to the disclosure of the identity of Maggie Alexander. Although defendant's agreement to identify employees outside the grand jury and subsequent production to the grand jury of a single document identifying Maggie Alexander may be construed as manipulative, the Court need not resolve the issue. As explained earlier, what is involved is really the use of the contents of the health care form containing her name, not defendant's act of production, and the existence and defendant's possession of such a document identifying an office employee was a "foregone conclusion"; moreover, as discussed below, any minimal use of that information was "harmless beyond a reasonable doubt."

## B. Harmless Beyond Reasonable Doubt

 Finally, the government relies on the application of the "harmless beyond a reasonable doubt" standard to defendant's Fifth Amendment claim. Defendant concedes that this doctrine applies, and it is clear that if the use of immunized information to obtain the indictment or conviction of defendant was so minimal as to be harmless beyond a reasonable doubt, there is no Fifth Amendment violation.

To begin with, of course, only an improper use of the act of production, as opposed to the contents of produced documents, is relevant, and the Court has concluded that the former did not occur. But even accepting the argument that some impermissible use occurred, in the scheme of things it was slight. The identification of Maggie Alexander and her testimony

were a small part of the developing evidence in the investigation conducted by the government. The decisions to refer the matter to the IRS and the United States Attorney's Office in the District of Columbia for investigation and possible prosecution, and to obtain tax information from the IRS through an *ex parte* order, were not dependent on information relating to Maggie Alexander, and such information played a very minor role in the affidavit in support of the search warrants for defendant's residence and office. Any use of arguably tainted information regarding the Citibank account or the money orders reflecting defendant's cash lifestyle was even less significant. Simply put, even without this information, the government knew enough to justify a thorough investigation, had enough to support the search warrants, and inevitably would have discovered through its untainted investigation the same information that defendant contends reflects an improper use of immunized documents.

The Court therefore concludes that the government would have obtained the search warrants, indictment and conviction even without the identity and testimony of Maggie Alexander as derived from the document defendant produced to the grand jury. Her existence and her grand jury testimony relating to defendant's documents constituted a very small piece of the overall evidentiary landscape developed through the investigation by the time of the searches, and certainly once those search warrants had been executed and returns made. Hence, the inclusion in the search warrant affidavit of references to Maggie Alexander's testimony relating to office procedures and the use of money orders by defendant was harmless beyond a reasonable doubt. This fall-back position urged by the government, then, is yet another basis upon which to deny defendant's claim of a Fifth Amendment viola-

tion, along with the fact that there was little, if any, use of the immunized act of production (as opposed to the contents of documents) and the clear evidence that independent, untainted sources existed and were utilized for virtually all the information of which defendant complains.

## CONCLUSION

There is no question that the circumstances relating to the tax investigation and prosecution of defendant raised legitimate issues under *Kastigar* and *Hubbell* that warranted an evidentiary hearing to determine whether the government's case was improperly tainted by defendant's prior production of documents and grand jury testimony under a grant of immunity. The Court held such a hearing and received two days of evidence and numerous submissions by defendant and by the government. Thereafter, the trial in this case developed further information shedding light on defendant's claim of a Fifth Amendment violation. Now that the dust has settled and full account has been taken of the course of the investigation, the use (if any) of immunized documents (or more correctly of the act of production of those documents), and the independent sources for virtually all the relevant information, the Court concludes for the reasons explained above that there was no violation of defendant's rights under the principles articulated in *Kastigar, Hubbell* and other cases, and that, in any event, any impermissible use was harmless beyond a reasonable doubt. Accordingly, defendant's renewed motion to suppress evidence and dismiss the charges against him under *Kastigar* and *Hubbell,* or alternatively for a new trial pursuant to Fed.R.Crim.P. 33, is denied. A separate order has been issued.

## ORDER

Upon consideration of defendant's renewed motion to suppress evidence and dismiss the charges against him, or alternatively for a new trial pursuant to Fed. R.Crim.P. 33, and for the reasons explained in the Memorandum Opinion issued on this date, it is hereby

ORDERED that defendant's motion is DENIED.