Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 13, 2006          Decided July 14, 2006

No. 03-3134

UNITED STATES OF AMERICA,
APPELLEE

v.

NAVRON PONDS,
APPELLANT

———

Consolidated with
No. 03-3135

———

Appeals from the United States District Court
for the District of Columbia
(No. 02cr00495-01)
(No. 03cr00283-01)

———

*Ketanji B. Jackson*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Roy W. McLeese, III* and *Mark H. Dubester*, Assistant U.S. Attorneys.

Before: ROGERS, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This appeal challenges the government's use of documents produced by Navron Ponds pursuant to a grant of immunity under 18 U.S.C. § 6002. Ponds' appeal of his convictions for tax evasion and fraud requires the court to address the breadth of that immunity for an act of production that, in its testimonial character, falls somewhere between the response to a fishing expedition addressed in *United States v. Hubbell*, 530 U.S. 27 (2000), and the production of documents whose existence was a "foregone conclusion" in *Fisher v. United States*, 425 U.S. 391 (1976). Because the government has failed to show with reasonable particularity that it knew of the existence and location of most of the subpoenaed documents, we hold that Ponds' act of production was sufficiently testimonial to implicate his right against self-incrimination under the Fifth Amendment to the Constitution. Although the government, to some extent, violated its immunity agreement with Ponds by impermissibly using his self-incriminating testimony and its derivative evidence, questions remain regarding the precise nature of its use and whether the constitutional error was harmless beyond a reasonable doubt. Accordingly, we reverse the judgment of conviction and remand the case to the district court to determine the extent of the government's impermissible use and whether that use was harmless beyond a reasonable doubt.

3

**I.**

In 1996, Navron Ponds, a criminal defense lawyer, agreed to represent a drug dealer named Jerome Harris. *See, e.g., United States v. Harris*, 176 F.3d 476 (4th Cir. 1999). As a retainer, Harris's mother agreed to give Ponds a white 1991 Mercedes Benz 500SL, which Ponds registered in his sister's name. Harris pled guilty. At his sentencing, the district court asked Harris about the whereabouts of the Mercedes for forfeiture purposes. Ponds failed to inform the court that he had the car. In 2000, when the United States Attorney's Office for the District of Maryland learned this from Harris, it began a grand jury investigation of Ponds' acquisition of the Mercedes and his failure to reveal his possession of the car to the court, focusing on potential charges of contempt of court, obstruction of justice, and money laundering. *See United States v. Ponds*, 290 F. Supp. 2d 71, 74 (D.D.C. 2003).

Maryland Assistant United States Attorney ("MD-AUSA") Sandra Wilkinson executed a search warrant for Harris's jail cell to obtain the retainer agreement discussing the Mercedes. Federal Drug Enforcement Administration agents went to Ponds' apartment complex, Albemarle House, looking for the car. Parked outside were the Mercedes, and in another parking space rented by Ponds, a Porsche with the vanity license plate "I OBJECT." According to apartment personnel, Ponds drove the Mercedes and his sister, Laura Ponds Pelzer, drove the Porsche. MD-AUSA Wilkinson issued a subpoena *duces tecum* ordering Ponds to produce seven categories of documents and the Mercedes. When Ponds expressed his intent to invoke his Fifth Amendment privilege against self-incrimination, Wilkinson revised the subpoena to omit requests that Ponds actually produce the car and that he produce financial and tax records, and filed a motion pursuant to 18 U.S.C. § 6003 for a judicial order authorizing act-of-production immunity under 18 U.S.C.

§ 6002. The subpoena made six demands of Ponds to produce "any and all documents" from 1996 forward:

1.  Referencing use, ownership, possession, custody and/or control of a white Mercedes Benz . . .;

2.  That refer or relate to payment of legal fees by or on behalf of Jerome Harris whether by cash, currency, or some other form of payment;

3.  That refer or relate to any vehicles in the custody or control of Jerome Harris if access to that vehicle was provided to you by any means, direct or indirect; and,

4.  That refer or relate to Sloan Solomon, Christine Privott [Harris's mother] or Laura P. Pelzer [Ponds' sister];

5.  Any and all correspondence between the Law Offices of Navron Ponds [and courts and prosecutors] in the matter of *U.S. v. Jerome Harris*, PJM 96-0269;

6.  Records of employees of the law Office of Navron Ponds in the time frame of 1996 to the present.

The district court granted the immunity request and ordered Ponds to produce the subpoenaed documents.

Armed with act-of-production immunity, Ponds appeared before the grand jury and produced approximately 300 pages of documents. The documents included records showing that: (1) the Mercedes and Porsche were registered in the name of Ponds' sister; (2) Ponds had financial accounts with his sister; (3) Ponds and his sister sold a Georgia property they had jointly owned; (4) Ponds possessed money order receipts used to pay for various services, mostly involving the Mercedes; and (5) Ponds

had a health insurance document indicating he had purchased insurance for himself and Magdalene Alexander. Ponds also testified before the grand jury, responding to the prosecutors' questions about the document production, including affirming that the health insurance document was responsive to the subpoena request for documents regarding his employees. Magdalene "Maggie" Alexander, Ponds' employee, was then called before the grand jury, where she testified about many of the produced documents and in detail about the process by which she helped Ponds produce them.

Soon after Ponds responded to the subpoena *duces tecum*, the Maryland United States Attorney's Office filed an *ex parte* application it had prepared before the subpoena response with the Maryland federal district court to authorize the Internal Revenue Service ("IRS") to disclose Ponds' 1996 and 1997 tax returns. The application was granted, and the IRS reported that Ponds had not filed tax returns in those years. Because Ponds was a resident of the District of Columbia, the Maryland prosecutors contacted the United States Attorney's Office for the District of Columbia about conducting a tax investigation of Ponds. These contacts involved several meetings and the transfer of documents produced by Ponds and of Maryland grand jury transcripts to DC-AUSA Mark Dubester and IRS Special Agent Nancy Becker.

The investigation continued, and in 2001, DC-AUSA Dubester applied for search warrants on the basis of an affidavit provided by Agent Becker that included information first learned in the Maryland grand jury. Based on those applications, the D.C. United States Attorney's Office secured warrants to search Ponds' home and office, where Agent Becker seized six boxes of documents. The documents revealed that Ponds had used a tax preparer, and the preparer's records were subpoenaed, uncovering further details about Ponds' financial

affairs. With these materials and others subpoenaed from financial institutions, Ponds was indicted in the District of Columbia on five counts of tax evasion under 26 U.S.C. § 7201, one count of wire fraud under 18 U.S.C. § 1343, and one count of fraud in the first degree under 22 D.C. Code §§ 3821(a), 3822(a)(1).

Ponds filed a pretrial motion for a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), that would force the government to "demonstrate that the charges in this matter and the evidence it proposes to use . . . at trial do not derive directly or indirectly from Mr. Ponds's immunized testimony and production of documents." The district court conducted an evidentiary hearing at which it heard testimony from Agent Becker and MD-AUSA Wilkinson, and accepted proffered testimony from DC-AUSA Dubester. *See Ponds*, 290 F. Supp. 2d at 73. The district court denied Ponds' motion to dismiss the indictment. *Id*. The jury convicted Ponds on all counts,[1] and the district court, upon denying Ponds' motion for reconsideration of the *Kastigar* ruling or for a new trial, sentenced Ponds to twenty months imprisonment and restitution to the federal and District governments. Ponds appeals.

## II.

18 U.S.C. § 6002 provides that:

> no testimony or other information compelled under [an immunity] order (or any information directly or

---

[1] In addition to the counts on which Ponds was indicted, Ponds was convicted of five "failure-to-file" counts which were charged by information. *See* 26 U.S.C. § 7203. The district court vacated those convictions without prejudice to a government motion to reinstate them if the convictions at issue here are vacated on appeal.

indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

This federal witness immunity statute has a constitutional dimension, as the Supreme Court in *Kastigar*, 406 U.S. 441, held that § 6002 "immunity from use and derivative use is coextensive with the scope of the [Fifth Amendment] privilege against self-incrimination" in that "[i]t prohibits the prosecutorial authorities from using the compelled testimony in *any* respect." *Id.* at 453. Thus, at issue in document production cases in which a witness with § 6002 immunity is subsequently prosecuted are two basic questions: (1) Was the defendant's act of producing the documents sufficiently testimonial that the Fifth Amendment privilege is implicated? (2) If so, did the government violate the defendant's Fifth Amendment rights (and the court order granting him immunity) by using sources of information derived from the immunized testimony in the prosecution? *See Hubbell*, 530 U.S. at 29-30.

The Fifth Amendment declares that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. At one point in our history, this declaration was taken to mean that the government could not compel the production of private papers. *See Boyd v. United States*, 116 U.S. 616, 634-35 (1886). In 1976, the Supreme Court changed course, and it is now a "settled proposition that a person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled' within the meaning of the privilege." *Hubbell*, 530 U.S. at 35-36 (summarizing *Fisher*, 425 U.S 391). "[T]he act of producing documents in response to a subpoena," however, "may have a

compelled testimonial aspect" in that the act "may implicitly communicate 'statements of fact,'" such as the witness's admission "that the papers existed, were in his possession or control, and were authentic." *Id.* at 36 & n.19 (quoting *United States v. Doe*, 465 U.S. 605, 613 & n.11 (1984)). Whether the act of producing evidence in response to a subpoena is sufficiently testimonial that the Fifth Amendment applies "depend[s] on the facts and circumstances of particular cases." *Fisher*, 425 U.S. at 410.

Two Supreme Court cases provide the framework for our analysis of the facts and circumstances of this case. In *Fisher,* 425 U.S. 391, the Court considered two cases in which IRS agents visited and interviewed taxpayers under investigation for tax violations. *See id.* at 393-94. After the interviews, the taxpayers obtained from their accountants documents used in preparing their tax returns and gave the documents to their lawyers. *See id.* at 394. Once the government discovered that the lawyers had the documents, it sought to subpoena the records. In one case, its subpoena demanded the accountant's workpapers pertaining to the taxpayer's books for three years, the retained copies of the taxpayer's returns for those years, and the retained copies of reports and other correspondence between the accountant and the taxpayer during those years. *Id.* After disavowing any Fifth Amendment protection for the contents of the documents themselves, the Court nevertheless recognized the testimonial aspect of the act of production because "[c]ompliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer," as well as "the taxpayer's belief that the papers are those described in the subpoena." *Id.* at 410. Under the circumstances of that case, however, the Court concluded it was "doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment" because "[t]he existence and location

of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." *Id.* at 411. Because the subpoena was more a question of "surrender" than of "testimony," the Court held that "no constitutional rights are touched." *Id.* (quoting *In re Harris*, 221 U.S. 274, 279 (1911)).

*Hubbell* provides the counterpoint to *Fisher*. In *Hubbell*, the Supreme Court held that Hubbell's act of producing over 13,000 documents in response to a broad subpoena was sufficiently testimonial to implicate the Fifth Amendment because "the prosecutor needed [Hubbell]'s assistance both to identify potential sources of information and to produce those sources." 530 U.S. at 41. Some of the broadest demands of that subpoena asked for all documents referring to "any direct or indirect sources of money or other things of value received by or provided to Webster Hubbell" and "Webster Hubbell's schedule of activities." *Id.* at 46-47. The Court held that "the collection and production of the materials demanded was tantamount to answering a series of interrogatories asking a witness to disclose the existence and location of particular documents fitting certain broad descriptions," *id.* at 41, in which it was "unquestionably necessary for [Hubbell] to make extensive use of 'the contents of his own mind' in identifying the hundreds of documents responsive to the requests in the subpoena," *id.* at 43. The government claimed that it was a "foregone conclusion" that Hubbell would possess the subpoenaed documents because "a businessman such as [Hubbell] will always possess general business and tax records that fall within the broad categories described in this subpoena," but the Court rejected that argument as "overbroad." *Id.* at 45.

The Supreme Court distinguished the circumstances in *Hubbell* from those in *Fisher*: "While in *Fisher* the Government

already knew that the documents were in the attorneys' possession and could independently confirm their existence and authenticity through the accountants who created them, here the Government has not shown that it had any prior knowledge of either the existence or the whereabouts" of the produced documents. *Id.* at 44-45. Whether an act of production is sufficiently testimonial to implicate the Fifth Amendment, therefore, depends on the government's knowledge regarding the documents before they are produced. In *Fisher*, the government knew of the existence of a set of documents relating to defined topics that were in the hands of the taxpayers' attorneys; in *Hubbell*, the government could not show its prior awareness of the existence or location of the produced documents. When *Hubbell* was heard in this court, we described the inquiry this way:

> [T]he government must establish its knowledge of the existence, possession, and authenticity of the subpoenaed documents with 'reasonable particularity' before the communication inherent in the act of production can be considered a foregone conclusion. In making this assessment, though, the focus must remain upon the degree to which a subpoena "invades the dignity of the human mind," and on the quantum of information as to the existence, possession, or authenticity of the documents conveyed via the act of production.

*United States v. Hubbell*, 167 F.3d 552, 579-80 (D.C. Cir. 1999) (citations omitted). Although the Supreme Court did not adopt the "reasonable particularity" standard in affirming our decision, it emphasized that the applicability of the Fifth Amendment turns on the level of the government's prior knowledge of the existence and location of the produced documents. *See Hubbell*, 530 U.S. at 44-45. Post-*Hubbell*, another circuit has applied the

reasonable particularity standard to determine whether an act of production is sufficiently testimonial to implicate the Fifth Amendment. *See In re Grand Jury Subpoena Dated April 18, 2003*, 383 F.3d 905, 910 (9th Cir. 2004). Because that standard conceptualizes the Supreme Court's focus in a useful way, so do we.

Once it is clear that an act of production is sufficiently testimonial to be protected by the Fifth Amendment's privilege against self-incrimination, the question remains how the government may use the compelled testimony and information derived therefrom in a later prosecution of the witness. In *Kastigar*, 406 U.S. 441, the Supreme Court held that § 6002 "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination" in that "[i]t prohibits the prosecutorial authorities from using the compelled testimony in *any* respect." *Id.* at 453. Therefore, when a person accorded § 6002 immunity is subsequently prosecuted, the government bears "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460.

With oral testimony, the bar on derivative use is easy to imagine. For example, if a murder suspect who has been granted immunity is called before a grand jury and asked whether he committed a murder and where the murder weapon is, his testimony may not be used against him in a criminal trial. In addition, the government may not use his testimony to retrieve the weapon for use against the witness at trial. Even if the government introduced the weapon without indicating that it learned of its location from the defendant's immunized grand jury testimony, only using fingerprints or DNA testing to link the weapon to the defendant, the weapon would still be barred because it was "directly or indirectly derived from" compelled testimony. If the police simply happened upon the weapon

through an ongoing investigation, however, the weapon could be used against the witness because it was "derived from a legitimate source wholly independent of the compelled testimony." *Kastigar,* 406 U.S. at 460; *see Hubbell*, 167 F.3d at 583-84.

With act-of-production immunity, the key question is whether, despite the compelled testimony implicit in the production, the government remains free to use the contents of the (non-testimonial) produced documents. In *Hubbell*, the Supreme Court rejected the "manna from heaven" theory[2] by holding the use of the contents of produced documents to be a barred derivative use of the compelled testimonial act of production. The Court did so by stating that it "cannot accept the Government's submission that [Hubbell's] immunity did not preclude its derivative use of the *produced documents"* as it "was only through [Hubbell]'s truthful reply to the subpoena that the Government received the incriminating documents of which it made 'substantial use . . . in the investigation that led to the indictment.'" *Hubbell*, 530 U.S. at 42-43 (emphasis added). In context, these statements indicate that the Supreme Court understands the contents of the documents to be off-limits because they are a derivative use of the compelled testimony regarding the existence, location, and possession of the documents. As stated by this court in *Hubbell*: "If the government did not have a reasonably particular knowledge of subpoenaed documents' actual existence, let alone their

---

[2] This theory states that "the act of production shields the witness from the use of any information (resulting from his subpoena response) beyond what the prosecution would receive if the documents appeared in the grand jury room or in his office unsolicited and unmarked, like manna from heaven." *Hubbell*, 167 F.3d at 602 (Williams, J., dissenting).

possession by the subpoenaed party, and cannot prove knowledge of their existence through any independent means, *Kastigar* forbids *the derivative use of the information contained therein* against the immunized party." *Hubbell*, 167 F.3d at 585 (emphasis added).  Or explained another way, the contents of the documents cannot be used against the witness because they are not "derived from a legitimate source wholly independent of the compelled testimony."  *Kastigar,* 406 U.S. at 460.  This approach treats documents revealed in an immunized act of production just like the weapon revealed pursuant to immunized testimony.  If the existence or location of the item was revealed through compelled testimony, the item is derivative of the testimony and may not be used by the government against the witness-defendant.

After determining *what* may not be used against the witness-defendant, the further question remains *how* that information may not be used.  The direct introduction of immunized information as evidence at trial would be a prohibited "use." *See Hubbell*, 530 U.S. at 41.  But § 6002 goes further, "provid[ing] a sweeping proscription of any uses, direct or indirect, of the compelled testimony and any information derived therefrom," functioning as "a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Kastigar*, 406 U.S. at 460 (footnotes omitted).  In *North v. United States*, 910 F.2d 843 (D.C. Cir. 1990), this court noted that "*Kastigar* does not prohibit simply 'a whole lot of use,' or 'excessive use,' or 'primary use' of compelled testimony.  It prohibits '*any* use,' direct or indirect." *Id.* at 861.  Accordingly, this court held that the government's use of immunized testimony to refresh the recollection of a grand jury witness constituted a "use" of the compelled testimony. *See id.*

14

Taken together, the bar on the use of information derived from a testimonial act of production by a witness with § 6002 immunity and the breadth of that bar create real risks for prosecutors planning on prosecuting those whom they subpoena. "The decision to seek use immunity necessarily involves a balancing of the Government's interest in obtaining information against the risk that immunity will frustrate the Government's attempts to prosecute the subject of the investigation." *Doe*, 465 U.S. at 616. That risk was manifested in the government's prosecution of Ponds.

## III.

The central question on appeal is whether the district court's reliance on "a sharp distinction" between the testimonial aspect of producing documents and the contents of the documents, *see Ponds*, 290 F. Supp. 2d at 79, is contrary to an essential holding of the Supreme Court in *Hubbell* that the use of the contents of documents may be a barred derivative use of the testimony inherent in the immunized act of producing those documents. Throughout its opinion, the district court emphasizes its understanding that § 6002 immunity is limited to the act of production and does not extend to the contents of documents. *See id.* at 80-81, 83, 84, 85, 86, 88, 91. Ponds contends that the district court has returned to the repudiated manna-from-heaven rationale by seeming to think that nothing is amiss if the prosecution uses the contents of the documents without reference to the testimony inherent in the act of production.

### A.

It is true that in *Hubbell* the Supreme Court drew a distinction between protected testimony as to the existence, location, and authenticity of documents inherent in the act of

production and the unprotected contents of the documents themselves.  *See Hubbell*, 530 U.S. at 37.  This distinction, however, is only relevant in the context of determining whether an act of production implicates the Fifth Amendment.  In that context, the contents of the documents are irrelevant for constitutional purposes because their preparation was not "compelled."  *See Fisher*, 425 U.S. at 409-10; *Doe*, 465 U.S. at 610-11.  Therefore, to determine whether an act of production implicates the Fifth Amendment, the court looks only to the communicative aspects of the act of production itself and to whether those tacit averments as to the existence and location of the documents add anything significant "to the sum total of the Government's information."  *Fisher*, 425 U.S. at 411.

The "sharp distinction" upon which the district court relied becomes less relevant, however, when a court proceeds to "the conceptually separate and temporally subsequent *Kastigar* inquiry."  *Hubbell*, 167 F.3d at 580.  This is because § 6002, coextensive with the protections of the Fifth Amendment, *see Kastigar*, 406 U.S. at 453, provides that a witness compelled by the district court to testify over an assertion of the Fifth Amendment privilege is not only protected from having that testimony used against him, but is also protected from having "any information directly or indirectly derived from such testimony" used against him.  When the government does not have reasonably particular knowledge of the existence or location of a document, and the existence or location of the document is communicated through immunized testimony, the contents of the document are derived from that immunized testimony, and therefore are off-limits to the government.

The government concedes that the contents of subpoenaed documents can sometimes be off-limits, describing the subpoena response in *Hubbell* as "sufficiently testimonial (as to the documents' existence and location) to be privileged, and to taint

the contents of the documents themselves." *Appellee's Br.* at 25. The government attempts to minimize the distinction that the district court drew between contents and act of production. It contends that the district court understood that the act of production could taint the contents of produced documents, but found that Ponds' act of production did not taint the contents of the produced materials because his act of production did not make the extensive testimonial representations that Hubbell did. The government reads the district court as understanding that act-of-production immunity could reach the contents of documents, but that in this case, immunity did not reach the documents' contents.

The district court distinguished Ponds' case from *Hubbell* in finding "the degree of interpretation, locating, cataloging and assembling of documents so important in *Hubbell* . . . simply not demanded by the narrow subpoena at issue here." *Ponds*, 290 F. Supp. 2d at 82. If the district court was correct that Ponds' act of production was insufficiently testimonial to implicate the Fifth Amendment, then it would be proper to deny protection to the contents of the produced documents. The district court opinion does not explicitly connect the discussion of the testimonial character of Ponds' act of production to its conclusion that the contents of the documents were unprivileged, however, which leads Ponds to contend that the district court had the errant understanding that § 6002 immunity only categorically reaches "testimony inherent in the act of production" and "plainly not the contents of the documents produced." *Ponds*, 290 F. Supp. 2d at 81; *see, e.g.*, *id.* at 84. Such an understanding would revive the rejected manna-from-heaven rationale whereby the government could use documents against an immunized party when it could do so without reference to how the documents were produced. That understanding would conflate the Fifth Amendment question—is the act of production sufficiently testimonial to warrant Fifth

Amendment protection? — with the immunity question — has the government used compelled testimony or the information directly or indirectly derived therefrom in prosecuting the witness? *See Hubbell*, 167 F.3d at 580. Although the contents of the documents are irrelevant to determining whether the act of production was testimonial, the government's use of the contents of the documents is critical in determining whether there was a derivative use of the compelled testimony that violates § 6002.

**B.**

Applying the lessons of *Fisher* and *Hubbell* to determine whether Ponds' act of production is better characterized as "testimony" or "surrender," we begin by addressing the threshold question of whether the government has "establish[ed] its [pre-subpoena] knowledge of the existence, possession, and authenticity of the subpoenaed documents with 'reasonable particularity'" such that "the communication inherent in the act of production can be considered a foregone conclusion." *Hubbell*, 167 F.3d at 579. Ponds contends that his act of production was sufficiently testimonial to trigger Fifth Amendment protection because he used the contents of his mind to interpret the subpoena's directions and to identify the documents in his possession that he believed were responsive. He maintains that the government was not focused on any tax offenses or any documents relevant to such offenses, citing MD-AUSA Wilkinson's statement that she was "surprised" by some of the documents produced as evidence of the government's lack of previous awareness of the existence and location of some of the documents. The government relies on the district court's finding that the subpoena was "narrow and specific, and reflected that the government already knew of the existence of the types of documents sought and their possession by defendant." *Ponds*, 290 F. Supp. 2d at 82.

As the critical inquiry is whether the government can show it had such "prior knowledge of either the existence or the whereabouts," *Hubbell*, 530 U.S. at 45, of the produced documents that their existence and location was a "foregone conclusion," *Fisher*, 425 U.S. at 411, the parties approach this inquiry by comparing and contrasting Ponds' subpoena to those in *Fisher* and *Hubbell*. By any measure, this subpoena falls somewhere in between the two: Unlike *Fisher*, the prosecutors here did not ask for "retained copies" of workpapers, tax returns, and correspondence about which they were sure of both the existence and location. *Compare Fisher*, 425 U.S. at 394, *with Ponds*, 290 F. Supp. 2d at 74. Unlike *Hubbell*, the set of topics for which the Maryland prosecutors sought "any and all documents" "refer[ring] or relat[ing]" to is somewhat defined. *Compare Hubbell*, 530 U.S. at 46-49, *with Ponds*, 290 F. Supp. 2d at 74. For most of the subpoena categories, however, the government has failed to establish its previous knowledge of the existence or location of the documents.

The existence and location of some subpoenaed documents were a foregone conclusion: For instance, the government must have known of the existence of the documents in Subpoena Demand No. 5, "[a]ny and all correspondence between the Law Offices of Navron Ponds [and courts and prosecutors] in the matter of *U.S. v. Jerome Harris*," because it was a party to that correspondence. And the government knew of the existence of documents referring to "payment of legal fees by or on behalf of Jerome Harris" (Subpoena Demand No. 2) because it had already seized a copy of Harris's retainer agreement from his prison cell. The failure of the government to identify each produced document specifically is of no moment. To be consistent with *Fisher*, in which there is no indication that the government knew of each document within the set of documents of which it was aware, the "reasonable particularity" standard cannot demand that the subpoena name every scrap of paper that

is produced. Because the government already had sufficient knowledge about the Harris documents, Ponds was simply surrendering them, not testifying, by complying with those demands in the subpoena.

The government's prior knowledge of the existence or location of other subpoenaed documents has not been established. First, the government has not shown any prior knowledge that documents regarding the "use, ownership, possession, custody and/or control of a white Mercedes Benz" (Subpoena Demand No. 1) were in existence or in Ponds' possession. Before the subpoena, the government knew that the Mercedes was normally parked at Ponds' apartment and was registered to his sister. *See Ponds*, 290 F. Supp. 2d at 83. But it had no idea that Ponds possessed some of the documents he produced — a registration card, auto insurance information, sales contracts, and the title — and has not shown it was even aware of the existence of the large range of correspondence and receipts that he produced regarding repairs and improvements to the Mercedes. In fact, MD-AUSA Wilkinson testified that "at the time that [she] sought Act of Production Immunity," she was seeking to determine "whether or not there were other documents that proved the longevity of [Ponds'] ownership of this car." This statement confirms that the government did not know "whether or not" documents relating to the car existed or were in Ponds' possession. Ponds' act of producing the car-related documents testified to their existence and his possession, which effectively communicated that he had long been the beneficial owner of the car. The government's prior knowledge that Ponds had possession of a Mercedes registered to his sister might render harmless the government's improper use of the subpoenaed documents relating to the car, because the documents mostly confirmed what the government already suspected, but the government's prior knowledge that he possessed the Mercedes is not enough to establish with

reasonable particularity its prior knowledge regarding the documents related to the Mercedes. As in *Hubbell*, where the Supreme Court rejected the government's claim of knowledge based on the "overbroad" claim that Hubbell was a businessman and therefore would have business-related documents, 530 U.S. at 45, the government cannot show knowledge by means of broad assumptions about car ownership, much less mere possession. *Cf. Hubbell*, 167 F.3d at 578.

Similarly, the government has not shown prior knowledge of the existence or location of documents relating to Ponds' sister, Laura Pelzer, (Subpoena Demand No. 4) a subpoena request that turned up documents regarding shared bank accounts and sales of shared real property. While in common parlance it might be a "foregone conclusion" that a person with a sibling will have documents relating or referring to the sibling — even if only a Christmas card or a parent's will — the reasonable particularity standard demands more. This court explained in *Hubbell* that "the government cannot simply subpoena business records and then claim the requisite knowledge for purposes of the Fifth Amendment by pointing to the existence of a business." *Hubbell*, 167 F.3d at 578. The court stated that "the [government]'s assertion that its knowledge of Hubbell's status as a consultant and a taxpayer carried with it a concomitant awareness of the existence and possession of his consulting and tax records similarly falls short." *Id.* at 579. Likewise, the government's knowledge of Ponds' status as a brother does not carry with it an awareness of the existence and possession of records about his sister. The government's prior knowledge that Ponds had a Mercedes and a sister cannot suffice to establish its prior knowledge of the existence and location of the documents relating or referring to those topics that Ponds, with immunity, produced in response to the subpoena.

In addition, the government has not shown that it had any prior knowledge of the existence or location of "[r]ecords of employees of the law Office of Navron Ponds in the time frame of 1996 to the present" (Subpoena Demand No. 6). The district court's determination that the existence and location of these documents was a foregone conclusion was based on pure inference: "[T]he Court concludes that it was a foregone conclusion in this day and age in the Washington area that a sole practitioner would have some staff, even if part-time or temporary, to assist him in his legal practice. Moreover, it was also a foregone conclusion that certain administrative documents, including health care forms, would exist with respect to such staff, and would be in defendant's possession." *Ponds*, 290 F. Supp. 2d at 85. This reasoning is reminiscent of "the overbroad argument that a businessman . . . will always possess general business and tax records," *Hubbell*, 530 U.S. at 45, an argument the Supreme Court found could not "cure [the] deficiency" of the government's failure to demonstrate its "prior knowledge of either the existence or the whereabouts" of the produced documents in *Hubbell*, *id.*

The request for documents relating to any employees — when the government did not know whether Ponds had employees, much less whether he had specific documents relating to them — "was tantamount to answering a series of interrogatories," *id.* at 41, asking Ponds if he had employees, and if so, what their names were. This is made clear by the fact that Ponds was asked in the Maryland grand jury whether the "insurance record" "serve[s] to provide information called for in the subpoena with respect to information about the employees of your law office," an inquiry to which Ponds answered "yes." It is further clarified by the fact that the subpoena asks for records regarding "employees" in the plural, indicating that the government did not really know about Ponds' employment practices. MD-AUSA Wilkinson's infirm belief that she had at

one time spoken with a secretary in Ponds' office — she testified that "it's possible I did, possible I didn't" — does not demonstrate the requisite knowledge of the existence and location of documents relating to Ponds' employees.

The face of the subpoena also displays the government's lack of knowledge when it asks for documents that "refer or relate to any vehicles in the custody or control of Jerome Harris if access to that vehicle was provided to you by any means" (Subpoena Demand No. 3). The "if" in that request demonstrates that the government did not know whether Harris had given Ponds access to any vehicles besides the Mercedes, much less whether there existed any documents that would prove such access. If Ponds had been directly asked when he appeared before the grand jury whether he had employees or whether Harris had given him access to any vehicles, the Fifth Amendment privilege would allow Ponds to refuse to answer. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 804-05 (1977). The government cannot make an end-run around the Fifth Amendment by fishing for a document that will answer a question for which it could not demand an answer in oral examination.

In sum, the government has failed to show with reasonable particularity that it had prior knowledge of the existence and location of many of the subpoenaed documents necessary to render their existence and location a "foregone conclusion." The Supreme Court has not defined the precise amount of cognition on the part of an immunized party necessary to render a subpoena response "testimonial," but it is clear here that, as in *Hubbell*, the government "needed [Ponds'] assistance both to identify potential sources of information and to produce those sources," *Hubbell*, 530 U.S. at 41, and "it is undeniable that providing a catalog of existing documents," *id.* at 42, rendered this subpoena response "testimony" rather than mere

"surrender." So much is evident in the government's admission that it was "surprised" by some of the documents produced.

## C.

Having determined that portions of Ponds' act of production were testimonial, the next question is whether the government violated its immunity agreement with Ponds by using that "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)." 18 U.S.C. § 6002. "When the government proceeds to prosecute a previously immunized witness, it has 'the heavy burden of proving that all of the evidence it proposes to use [or has used] was derived from legitimate independent sources.'" *North*, 910 F.2d at 854 (quoting *Kastigar*, 406 U.S. at 461-62). As the primary evidence used to secure Ponds' indictment was the records seized during the searches of his home and office (and other information turned up from leads in those records), the inquiry under § 6002 must focus on the period before those searches to determine whether the subpoenaed documents derived from Ponds' act of production were used to either focus the investigation before the searches or to craft the search warrant affidavit, or if wholly independent evidence supported those actions. *See United States v. Kurzer*, 534 F.2d 511, 515 (2d Cir. 1976).

Ponds contends that the government violated his Fifth Amendment privilege by using the produced documents at two points: in establishing its evasion theory of the case and in crafting the search warrant application. Of course, § 6002 is "a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Kastigar*, 406 U.S. at 460

(footnotes omitted). Section 6002's "sweeping proscription," *id.*, of any use of compelled testimony without doubt bars the use of immunized information in an affidavit in support of a search warrant that turns up evidence used against the witness in a subsequent prosecution. *See United States v. Nanni*, 59 F.3d 1425, 1443 (2d Cir. 1995).

The district court noted the "government conce[ssion] that, to a limited extent, the IRS made use of some documents the defendant had produced to the grand jury to support the search warrant affidavits." *Ponds*, 290 F. Supp. 2d at 75. Furthermore, the district court found that "the record is clear (and the government acknowledges) that Maggie Alexander was identified and then made certain statements to the grand jury based on documents that the defendant [Ponds] produced" and that "[s]ome of those statements were included in the search warrant affidavit," *id.* at 87, but found this unproblematic because Ponds "cannot point to any testimonial aspect of [his] act of production — as opposed to the contents of the documents themselves — that was used by the government to obtain the search warrants," *id.* at 88. As discussed, this finding is legally erroneous because it fails to recognize that non-testimonial evidence derived from this testimonial act of production may not be used under § 6002.

Nevertheless, although the district court's findings regarding the use of immunized documents make clear that some impermissible derivative use occurred, the degree of the *Kastigar* violation is less apparent. The government is free to use a piece of information that appears in an immunized document if it can accomplish its "affirmative duty" of proving that the information was "derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460. As this court has emphasized that such an "inquiry must proceed witness-by-witness; if necessary, it will proceed

line-by-line and item-by-item," *North*, 910 F.2d at 872, the district court is better positioned to make such a determination in the first instance.

Determining the precise manner in which Ponds' rights were violated is essential because the finding of a *Kastigar* violation does not resolve Ponds' challenge to his convictions. "Dismissal of the indictment or vacation of the conviction is not necessary where the use is found to be harmless beyond a reasonable doubt," *North*, 910 F.2d at 854 (citations omitted), because "the error complained of did not contribute to the [outcome] obtained," *Chapman v. California*, 386 U.S. 18, 24 (1967). Where, as here, the immunized evidence emerges early in the investigation, the court must determine whether the government "would have taken the same steps entirely apart from the motivating effect of the immunized testimony." *Nanni*, 59 F.3d at 1433. As to the use of Ponds' documents and Maggie Alexander's testimony in the search warrant affidavits, "[t]he question thus becomes whether that use was harmless beyond a reasonable doubt in the sense that the immunized testimony was so inconsequential that it could not have influenced either the government's decision to request search warrants or the issuing magistrate's decision to grant them." *Id.* at 1443. In this determination, "[t]he government cannot escape its error simply by showing the availability of 'wholly independent' evidence from which it *might* have procured indictment or conviction had it not used the immunized testimony," *United States v. Pelletier*, 898 F.2d 297, 303 (2d Cir. 1990) (emphasis added), but must demonstrate beyond a reasonable doubt that the tax evasion case *would* have been vigorously pursued, and the search warrant sought and obtained, had the government not relied on the documents revealed by Ponds' act of production. Unless the government's use of *Kastigar* evidence, in light of evidence from independent sources, was "'so unimportant and insignificant' and ha[s] so 'little, if any, likelihood of having

changed the result of the proceeding' that [it] 'may be deemed harmless,'" *United States v. Gallo*, 859 F.2d 1078, 1082 (2d Cir. 1988) (quoting *Chapman*, 386 U.S. at 22) (alterations omitted), the violation of Ponds' right not to be a witness against himself cannot be excused as harmless beyond a reasonable doubt.

The government has not shown that it had reasonably particular knowledge of the existence and location of some of the documents it subpoenaed from Ponds. It has conceded that, to some extent, it used those documents to prepare its prosecution of Ponds. Accordingly, we reverse the judgment of conviction and we remand the case to the district court to consider the degree of the government's impermissible use and to determine whether that use was harmless beyond a reasonable doubt.[3]

---

[3] If the district court determines upon remand that the convictions of tax evasion and fraud should stand, then as Ponds contends and the government agrees, the district court must determine, in light of its treatment of the sentencing guidelines as mandatory, *see United States v. Booker*, 125 S. Ct. 738 (2005), and an unclear record on the question of prejudice as a result, whether its error prejudiced Ponds because it would have imposed a sentence materially more favorable to Ponds if it had known of the post-*Booker* sentencing regime, *see United States v. Coles*, 403 F.3d 764, 767 (D.C. Cir. 2005).