*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-BG-0891

IN RE JEFFREY B. CLARK, RESPONDENT.

A Member of the Bar of the District of Columbia Court of Appeals

(Bar Registration No. 455315)

On Petition for Rehearing
(DDN: 2021-D193; BDN: 22-BD-39)

(Argued February 23, 2024                    Decided March 15, 2024)

*Charles Burnham*, *Harry W. MacDougald*, of the bar of the State of Georgia, *pro hac vice*, and *Robert A. Destro*, of the bars of the States of California and Ohio, *pro hac vice*, for respondent Jeffrey B. Clark.

*Hamilton P. Fox, III*, Disciplinary Counsel, *Theodore (Jack) Metzler*, Senior Assistant Disciplinary Counsel, and *Jason R. Horrell*, Assistant Disciplinary Counsel, for Office of Disciplinary Counsel.

Before DEAHL[*] and HOWARD, *Associate Judges*, and GLICKMAN, *Senior Judge.*

---

[*] Associate Judge AliKhan was a member of the panel that initially ruled on the motion to enforce a subpoena. Following her appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Judge Deahl was assigned to take her place on the panel for purposes of considering the instant petition for rehearing.

PER CURIAM: This matter involves a motion to enforce a subpoena *duces tecum* that the Office of Disciplinary Counsel ("ODC") served on Mr. Clark, a member of our bar, in connection with disciplinary charges filed by ODC against him. Those charges, which are pending before a hearing committee of the District of Columbia Board on Professional Responsibility, assert that Mr. Clark violated our Rules of Professional Conduct by actions he took while serving as an Assistant Attorney General in the United States Department of Justice. In opposition to ODC's motion to enforce the subpoena, Mr. Clark contends that a federal statute, 28 U.S.C. § 530B, deprives this court and the Board of jurisdiction to discipline him for his alleged professional misconduct as a Department of Justice official. In addition, Mr. Clark argues that the subpoena cannot be enforced against him because it infringes on his Fifth Amendment right not to be "compelled in any criminal case to be a witness against himself."[1]

We initially granted ODC's motion to enforce the subpoena. Mr. Clark then petitioned for rehearing. We granted that petition and, following oral argument, issued an order on February 26, 2024, denying ODC's motion on the ground that enforcing the subpoena would violate Mr. Clark's Fifth Amendment privilege

---

[1] U.S. CONST. amend. V.

against self-incrimination. The order stated that an opinion explaining our decision would issue in due course. This is that opinion.

## I.

ODC instituted formal disciplinary proceedings against Mr. Clark in July 2022. Its specification of charges alleges that, while serving in the Department of Justice as both Assistant Attorney General for the Environment and Natural Resources Division and Acting Assistant Attorney General for the Civil Division, Mr. Clark "attempted to engage" in conduct involving dishonesty that would seriously interfere with the administration of justice, in violation of D.C. Rules of Professional Conduct 8.4(a), (c), and (d). These charges are based on Mr. Clark's alleged activities to subvert the results of the 2020 presidential election.

In brief, ODC alleges the following: In December 2020, Mr. Clark drafted a letter falsely asserting, among other things, that the Department of Justice had serious concerns about the integrity and outcome of the election in Georgia and urged that a special session of the Georgia legislature be convened to address those concerns and choose between competing slates of electors, one that would favor then-President Trump (and the other that favored now-President Biden). Mr. Clark urged his superiors, Deputy Assistant Attorney General Jeffrey Rosen and Principal

Associate Deputy Attorney General Richard Donoghue, to sign and send this letter, but they refused to do so because of its falsity. Mr. Clark then informed Mr. Rosen and Mr. Donoghue on January 2, 2021, that President Trump had offered him the position of Acting Attorney General, and that he was thinking of accepting that offer if they remained unwilling to send the letter, but they again refused to do so. The following day, Mr. Clark told Mr. Rosen that he intended to accept President Trump's offer to become Acting Attorney General and would send the letter himself. This precipitated a meeting with the President attended by Mr. Clark, Mr. Rosen, Mr. Donoghue, the White House Counsel, and other senior lawyers, at which Mr. Clark said he would send the letter if he were appointed Acting Attorney General, and all the other lawyers present expressed their opposition to the letter and Mr. Clark's appointment and warned it would trigger their resignations. President Trump decided not to appoint Mr. Clark as Acting Attorney General, and the letter was never sent.

The allegations of Mr. Clark's conduct in connection with the draft letter came to light in the congressional investigations following the storming of the Capitol during the certification of the Electoral College vote on January 6, 2021. In October 2021, Senator Richard J. Durbin, as Chair of the U.S. Senate Judiciary Committee, referred Mr. Clark to ODC for possible violations of the D.C. Rules of Professional

Conduct. ODC opened an investigation, which culminated in July 2022 with the commencement of the current disciplinary proceeding against Mr. Clark. On October 6, 2022, ODC served Mr. Clark with a subpoena for documents. The subpoena directs Clark to:

> Produce all documents and records . . . of which you were aware before January 4, 2021, that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state. . . . Produce all documents and records containing information of election fraud or election irregularities that came to your attention following the announcement of Attorney General Barr on December 1, 2020, that the Department [of Justice] had found no evidence of fraud on a scale that could have affected the results of the presidential election. . . .

> Produce any file or collection of materials or correspondence, written or electronic, relating to any efforts that you made between the November 3, 2020, presidential election and January 4, 2021, that relate in any way to any efforts you made to persuade officials of the United States Department of Justice to intervene in the certification by any state, specifically including Georgia, of the results of that election. . . .

> Provide the results of any legal research that you conducted, had conducted, or received before January 4, 2021, that relate to the authority of the United States Department of Justice to intervene in the certification by any state of the results of a presidential election, including the circumstances under which the Department is authorized to intervene, the quantum of proof necessary for such an intervention, the officials within the Department whose responsibility it is to initiate such an intervention, and the form that such intervention should take. This information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant

Attorney General of the Environmental and Natural Resources Division to investigate allegations of election fraud.

Provide all written policies and guidelines of the Department of Justice, of which you were aware and that were in effect between November 3, 2020, and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President.

Produce any documents supporting the contention that you were Acting Attorney General on January 3, 2021.

On October 17, 2022, shortly after being served with this subpoena, Mr. Clark filed a notice purporting to remove the disciplinary proceeding in its entirety to the United States District Court for the District of Columbia. ODC opposed the notice and moved to remand; in addition, on October 26, 2022, ODC moved in this court for an order enforcing its document subpoena. We held that motion in abeyance pending the resolution of Mr. Clark's removal of the matter to federal court. In June 2023, the district court held that it lacked subject-matter jurisdiction over the disciplinary proceeding and granted ODC's motion to remand the matter to this court.[2] Mr. Clark noted an appeal to the D.C. Circuit. After the D.C. Circuit denied Mr. Clark's motion to stay the district court's remand order pending the appeal,[3] we

---

[2] *In re Clark*, No. 22-mc-0096, 2023 U.S. Dist. LEXIS 100128 (D.D.C. June 8, 2023).

[3] *Clark v. D.C. Off. of Disciplinary Counsel (In re Clark)*, No. 23-7073, 2023 U.S. App. LEXIS 28613 (D.C. Cir. Oct. 26, 2023); *see also id.*, 2024 U.S. App.

issued a summary order granting ODC's motion to enforce its subpoena. Mr. Clark then filed the instant petition for rehearing of that motion.

Meanwhile, in August 2023, an indictment was filed in Fulton County (Georgia) Superior Court against Mr. Clark and numerous other defendants. The indictment, which is still pending, charges Mr. Clark by name with racketeering and a "criminal attempt to commit false statements and writings." Those charges are based on substantially the same alleged conduct as the pending disciplinary charges against Mr. Clark brought by ODC and addressed by ODC's subpoena.[4] The charges in the pending indictment of Donald J. Trump in the United States District Court for the District of Columbia for conspiracy to defraud the United States and other offenses also are based, in part, on the allegations of Mr. Clark's conduct underlying the disciplinary complaint; he is identified in that indictment not by name, but as "Co-Conspirator 4, a Justice Department official who worked on civil matters and who, with the Defendant, attempted to use the Justice Department to open sham election crime investigations and influence state legislatures with knowingly false

---

LEXIS 2762 (D.C. Cir. February 6, 2024) (denying Mr. Clark's motion for reconsideration of the denial of a stay). Mr. Clark's appeal in the D.C. Circuit is still pending as of the date of this opinion.

[4] *See Georgia v. Trump, et al.*, No. 23SC188947 (Fulton Cty. Super. Ct.).

claims of election fraud."[5]  The indictment describes Mr. Clark's draft letter as among the means of effectuating the criminal conspiracy "to defraud the United States by using dishonesty, fraud, and deceit to impair, obstruct, and defeat the lawful federal government function by which the results of the presidential election are collected, counted, and certified by the federal government."

## II.

We begin by addressing Mr. Clark's threshold objection, which is that this court and the Board on Professional Responsibility lack jurisdiction to discipline him for any misconduct he committed in his role as an Assistant Attorney General in the Department of Justice.  We believe this objection is without merit.

It is undisputed that Mr. Clark chose to be, and at all relevant times has been, a member of the Bar of the District of Columbia.  Congress empowered this court to exercise plenary disciplinary authority over the members of our Bar,[6] and this court has exercised that authority.  As our Bar Rules state, "[a]ll members of the District

---

[5] *See United States v. Trump*, No. 1:23-cr-00257-TSC (D.D.C.).

[6] *See* D.C. Code § 11-2501 *et seq.*

of Columbia Bar . . . are subject to the disciplinary jurisdiction of this Court and its

Board on Professional Responsibility."[7]  And as the Bar Rules also state,

> The license to practice law in the District of Columbia is a continuing proclamation by this Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and an officer of the Court. It is the duty of every recipient of that privilege *at all times and in all conduct*, both professional and personal, to conform to the standards imposed upon members of the Bar as conditions for the privilege to practice law.[8]

Accordingly, acts or omissions by an attorney in violation of the Rules of

Professional Conduct "shall be grounds for discipline, whether or not the act or

omission occurred in the course of an attorney-client relationship."[9]

There is no exemption or immunity from bar discipline under our Rules for

D.C. Bar members who violate those Rules while serving as attorneys for the federal

government, in the Department of Justice or elsewhere.  In fact, both Congress and

the Department of Justice have made this clear.  In 1998, Congress enacted the so-

called "McDade Amendment," 28 U.S.C. § 530B, which provides:

> (a) An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties,

---

[7] D.C. Bar R. XI § 1(a).

[8] *Id.* § 2(a) (emphasis added).

[9] *Id.* § 2(b).

*to the same extent and in the same manner as other attorneys in that State* [emphasis added].

(b) The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.

(c) As used in this section, the term "attorney for the Government" includes any attorney described in section 77.2(a) of Part 77 of title 28 of the Code of Federal Regulations and also includes any independent counsel, or employee of such a counsel, appointed under chapter 40.

The rules promulgated by the Attorney General to implement this statute are set forth in 28 C.F.R. Part 77. Section 77.2(a), which subsection (c) of the statute incorporates by explicit reference, states that the term "attorney for the Government" includes virtually all attorneys employed by the Department of Justice (from the Attorney General on down), specifically including Assistant Attorneys General. Hence Mr. Clark was and is covered by the McDade Amendment and 28 C.F.R. Part 77.

Mr. Clark argues that while 28 U.S.C. § 530B(a) subjects Government attorneys to the ethical rules of "States" where they perform their duties, the District of Columbia is not a State, and the statute does not explicitly say that any Government attorneys are subject to the District's rules. Therefore, he argues, the statute means he was not subject to discipline by this court or its Board on

Professional Responsibility for violating the D.C. Rules of Professional Conduct while performing his duties as an Assistant Attorney General.

Mr. Clark made this same argument to the United States District Court for the District of Columbia in his effort to remove these proceedings to federal court. The district court rejected the contention as not only unpersuasive, but completely absurd. "To accept Mr. Clark's position," the district court explained,

> would be to subscribe to the absurd proposition that Congress chose to make [the Attorney General, the other senior officials of the Justice Department, and all the rest of the Department's attorneys] subject to jurisdictional rules of professional conduct everywhere except where they work. . . . That D.C. is home to, by far, the most government lawyers in the country only compounds this absurdity.[10]

Moreover, the district court found, the legislative history of the McDade Amendment focused heavily on its needed application to prosecutions and investigations that are conducted in the District of Columbia, and thus "confirms

---

[10] *In re Clark*, 2023 U.S. Dist. LEXIS 100128, at \*34.

beyond a whisper of doubt that Congress did not intend to exempt D.C." from 28 U.S.C. § 530B.[11]

We agree that Mr. Clark's interpretation of Section 530B is unsound; the word "State" in the statute must be construed to encompass the District of Columbia because that effectuates Congress's goal of requiring all federal government attorneys to be governed by the same rules as other attorneys in the jurisdictions where they work. As the D.C. Circuit Court explained in *Wasserman v. Rodacker*, "[t]here is a longstanding legal tradition of interpreting 'State' in various federal statutes as encompassing the District of Columbia. . . . when that interpretation reflects Congress's intent."[12] In the case of the McDade Amendment, to quote *Wasserman*, "[w]e can think of no policy reason, no logical reason, no reason whatever why Congress would have intended otherwise."[13] There is no evidence of such an intent. Mr. Clark himself identifies no reason why Congress would have wanted to exempt the many federal government attorneys licensed in the District of Columbia and performing their duties here from the Rules of Professional Conduct

---

[11] *Id.* at *34-*35.

[12] *Wasserman v. Rodacker*, 557 F.3d 635, 639 (D.C. Cir. 2009) (citing Supreme Court and other cases).

[13] *Id.* at 639-40.

governing lawyers admitted to the Bar of this court, in stark contrast to federal government attorneys in every other jurisdiction, and we can conceive of no reason. And the contention advanced by Mr. Clark does, indeed, appear to suffer from absurdity, as the district court discerned in the removal proceeding. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."[14]

Any remaining doubt is dispelled by the regulations that the Attorney General promulgated to implement Section 530B. Those regulations specifically define the state rules of professional responsibility to which Department attorneys are subject as including those "rules enacted or adopted by any State or Territory of the United States *or the District of Columbia . . .* that prescribe ethical conduct for attorneys and that would subject an attorney, whether or not a Department attorney, to professional discipline, such as a code of professional responsibility."[15] In adopting that definition, the Attorney General clearly has embraced a reasonable interpretation of Section 530B that is consistent with prior case law. And our past

---

[14] *Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982).

[15] 28 C.F.R. § 77.2(h) (emphasis added); *see also id.* § 77.2(i) (defining the phrase "state of licensure" to mean "the District of Columbia or any State or Territory where a Department attorney is duly licensed and authorized to practice as an attorney."

precedents support that interpretation as well; in accordance with the Department's regulations, and without jurisdictional objection, attorneys for the federal government working in the District of Columbia have been subject to disciplinary proceedings before the Board on Professional Responsibility and this court.[16]

Accordingly, we reject Mr. Clark's contention that 28 U.S.C. § 530B deprives this court and the Board on Professional Responsibility of disciplinary jurisdiction over his conduct as an Assistant Attorney General.

## III.

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[17] This privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the [person] reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."[18] Thus, the privilege "extends beyond

---

[16] *See, e.g.*, *In re Dobbie*, 305 A.3d 780 (D.C. 2023); *In re Kline*, 113 A.3d 202 (D.C. 2015).

[17] U.S. CONST. amend. V.

[18] *Carter v. United States*, 684 A.2d 331, 338 (D.C. 1996) (quoting *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972)).

answers that would in themselves support a conviction to those which would furnish a link in the chain of evidence against the witness."[19]  To sustain an assertion of the privilege against self-incrimination, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."[20]

The privilege against self-incrimination has a limited application to a governmental demand for the production of documents.  By its terms, "the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a testimonial communication that is incriminating."[21]  Documents that have been prepared voluntarily or by a third party are not "compelled," and therefore "a person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents

---

[19] *Butler v. United States*, 890 A.2d 181, 187 (D.C. 2006) (citation omitted); *see also Hoffman v. United States*, 341 U.S. 479, 486 (1951) (stating same).

[20] *Alston v. United States*, 383 A.2d 307, 312 (D.C. 1978) (quoting *Hoffmann*, 341 U.S. at 486-87); *see also Marchetti v. v. United States*, 390 U.S. 39, 53 (1968) (holding that the privilege applies only in the face of "substantial and real, and not merely trifling or imaginary, hazards of incrimination").

[21] *Fisher v. United States*, 425 U.S. 391, 408 (1976).

was not 'compelled' within the meaning of the privilege."[22]  However, where "the act of producing documents in response to a [government] subpoena" has "a compelled testimonial aspect[,]" the privilege may "protect[] the act of production itself," which is "a question that is distinct from the question whether the unprotected contents of the documents themselves are incriminating."[23]

If "by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic[,]" and if "such admissions genuinely would be incriminating," then the holder of the documents would have a limited Fifth Amendment privilege with respect to the act of production."[24]  (The same is true, of course, if the document requests are framed to elicit other incriminating admissions from compliance, be those admissions explicit or implicit.)  But this "act of production" privilege "is not automatic"; it is not available "if the existence, possession, and authenticity of a document is a 'foregone conclusion,' as would be the case if the act of production

---

[22] *United States v. Hubbell*, 530 U.S. 27, 35-36 (2000).

[23] *Id.* at 36-37.

[24] *In re Pub. Def. Serv.*, 831 A.2d 890, 912 (D.C. 2003) (quoting *Hubbell*, 530 U.S. at 37 n.19).

'adds little or nothing to the sum total of the Government's information.'"[25] "Determining the existence of an act of production privilege is a fact-specific inquiry, which turns on the 'facts and circumstances of particular cases or classes thereof.'"[26]

Applying these principles in this case, we conclude that Mr. Clark has asserted a valid act-of-production privilege in response to ODC's document subpoena. The subpoena requests Mr. Clark to produce documents in his possession that relate directly to the central charges against him in the two pending indictments. Given how the requests are phrased, Mr. Clark's compelled production of responsive documents to the questions clearly would have a potentially incriminating "testimonial aspect."

Consider: The first request in the subpoena appears to be a blend of document request and interrogatory. It demands that Mr. Clark produce all documents of which he was "aware" before January 4, 2021, "that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or

---

[25] *Id.* (quoting *Fisher*, 425 U.S. at 411).

[26] *Id.* at 912-13 (quoting *United States v. Doe*, 465 U.S. 605, 613 (1984)).

any other state."[27]   Further, the request separately requires that Mr. Clark produce (and evidently identify) those documents that "came to [his] attention following the announcement of Attorney General Barr on December 1, 2020, that the Department of Justice had found no evidence of fraud on a scale that could have affected the results of the presidential election."   Whatever documentation Mr. Clark might provide in response to these demands (or if his response would be that he has no documents of the type called for) would amount to a testimonial admission on his part as to the state of his knowledge (or lack of knowledge) at the relevant time of evidence supporting the truthfulness of his allegedly dishonest (and criminal) draft letter.  More than that, his production would implicitly communicate his thoughts as to the meaning and significance of any evidence of irregularities he might identify, and, possibly, what countervailing evidence he neglected or chose to disregard.  In this fashion, the first request in the subpoena demands that Mr. Clark make admissions that would help the government establish that he had no grounds to assert in his draft letter that the Department of Justice had concerns about the Georgia election.

---

[27] As an aside, we note that this request appears to have been poorly phrased. As written, it requests *documents* that themselves may have affected an election outcome.  Presumably, the subpoena was intended to request documents evidencing *irregularities* that may have affected an election outcome.

ODC rejoins that this subpoena request does not ask Mr. Clark to produce documents and information he thinks would be incriminating, but only evidence he believes would exculpate him. This rejoinder (which does not apply to the rest of the subpoena) is unpersuasive. It amounts to a concession that the subpoena demands an explicitly and implicitly testimonial response from Mr. Clark concerning his knowledge and mental state when he engaged in the conduct that forms the basis for his potential criminal liability. And while Mr. Clark might view his evidentiary response as exculpatory, a prosecutor might view it quite differently; for example, what Mr. Clark might view as exculpatory evidence might strike a prosecutor as revealingly inadequate to justify Mr. Clark's actions in drafting the letter and urging that it be sent over the objections of informed Justice Department officials who told him that it was false.

The other requests in the subpoena suffer from the same basic flaws. The second request demands that Mr. Clark produce any documents in his possession that "*relate in any way* to any efforts" he made to persuade Justice Department officials to intervene in Georgia's (or any other state's) certification of its presidential election results. The third request, essentially either a subset or an enlargement of the second, is a sweeping demand for Mr. Clark to produce "any legal research that [he] conducted, had conducted, or received before January 4,

2021," relating to the Justice Department's authority to intervene in a state's certification of its presidential results. These are much more than requests for voluntarily created documents of a certain specified character that Mr. Clark happens to have. They require him not only to "admit that the [documents] existed, were in his possession or control, and were authentic," but to acknowledge the relationship between those documents and his allegedly criminal conduct. This amounts to a demand that Mr. Clark be a witness against himself by sifting through the documents in his possession to provide a documented roadmap, testimonial in character, supporting the prosecution case against him.

Like the first request, the fourth document request in the subpoena requires a testimonial response from Mr. Clark because it calls for him to identify and produce certain documents of which he was "aware" when (as alleged in the federal indictment) he conspired with the President—specifically, any Justice Department policies or guidelines relating to the circumstances under which Mr. Clark, as a Justice Department lawyer, would have been permitted to be in direct contact with officials of the White House or the Executive Office of the President in late 2020. Mr. Clark's response could lend support to his criminal prosecution, for example if it would be tantamount to an admission that he knew his alleged contact with the President regarding his draft letter was improper.

Lastly, the fifth subpoena request calls for Mr. Clark to produce any documents supporting the contention that he was Acting Attorney General on January 3, 2021. This too appears to be seeking evidentiary support for one of the accusations at the heart of the indictments, i.e., the claim (attributed to Mr. Clark in his discussions with Messrs. Rosen and Donoghue) that there was some sort of *quid pro quo* agreement that the President would appoint Mr. Clark to be the Acting Attorney General in order to send the letter he drafted to Georgia state officials under the Justice Department's auspices. Mr. Clark's production, identification, and authentication of such evidence would be testimonial and incriminating. (Alternatively, Mr. Clark's inability to produce evidence that he had been or, at least, was about to be appointed Acting Attorney General could be viewed as an implicit admission that he acted dishonestly when he pressured his superiors to send the letter he had drafted.)

In sum, the act of production and the provision of the related information explicitly sought by ODC's subpoena would be sufficiently testimonial and potentially incriminating to entitle Mr. Clark to invoke his Fifth Amendment privilege not to be compelled to be a witness against himself. And ODC has not shown with the requisite particularity that this is a case in which the existence, possession, and authenticity of any of the requested documents is a "foregone

conclusion," or that the act of production would "add little or nothing to the sum total of the Government's information."[28]  Indeed, at oral argument on Mr. Clark's petition for rehearing, ODC acknowledged that its primary concern was to obtain relevant documents from Mr. Clark of which it has no knowledge, as part of its preparation for the disciplinary hearing.  We have no reason to suppose that the prosecuting authorities already know more than ODC does.

## IV.

For the foregoing reasons, we have upheld Mr. Clark's assertion of his Fifth Amendment privilege against self-incrimination with respect to the subpoena duces

---

[28] ODC's surmise that Mr. Clark must have some documents responsive to the subpoena, given the alleged assertions in his draft letter and his interactions with Mr. Rosen, Mr. Donoghue, and President Trump, is insufficient.  *See Hubbell*, 530 U.S. at 45 ("The Government cannot cure this deficiency through the overbroad argument that a businessman such as respondent will always possess general business and tax records that fall within the broad categories described in this subpoena."); *see also, e.g.*, *United States v. Ponds*, 454 F.3d 313, 316 (D.C. Cir. 2006) ("Because the government has failed to show with reasonable particularity that it knew of the existence and location of most of the subpoenaed documents, we hold that Ponds' act of production was sufficiently testimonial to implicate his right against self-incrimination under the Fifth Amendment to the Constitution.").

tecum before us in this case.[29]  We therefore denied, on Fifth Amendment grounds,

ODC's motion to enforce that subpoena.

---

[29] We note two things.  First, that we uphold Mr. Clark's assertion of privilege does not mean he will be exempt from procedural rules requiring him to disclose in advance any documentary evidence on which he intends to rely at the evidentiary hearing before a hearing committee of the Board on Professional Responsibility.  *See* Bd. Pro. Resp. R. 7.17 ("Presentation of Documentary Evidence").  His failure to comply with those rules might result in his inability, under the Board's rules, to introduce documentary evidence in his defense that he did not otherwise disclose in advance.  We reserve judgment on any issues that might arise on that front.

Second, we express no view as to whether Mr. Clark's successful assertion of his Fifth Amendment privilege with respect to the document subpoena could form the basis for an adverse inference against him by the Hearing Committee.  The parties before us have not addressed this question in this appeal.  Although, unlike in a criminal case, an adverse inference generally is permissible in a civil case, *see In re D.B.*, 947 A.2d 443, 451 n.15 (D.C. 2008), we do not appear to have squarely decided this question in the context of a disciplinary proceeding.  *See In re Fay*, 111 A.3d 1025, 1032 (D.C. 2015) (per curiam) ("Because disciplinary proceedings are quasi-criminal, attorneys subject to discipline are entitled to due process of law. . . . However, disciplinary proceedings are *not* criminal proceedings, and attorneys are not afforded all of the protections which are extended to criminal defendants." (internal quotation marks omitted; emphasis original)); *In re Burton*, 472 A.2d 831, 845-46 (D.C. 1984) (rejecting Burton's burden-shifting argument on the ground that the hearing committee had "made it clear that it was drawing no adverse inference based on [his] failure to testify… [or his] invoking his Fifth Amendment privilege against self-incrimination when [he] was called as a witness by Bar Counsel" (internal quotation marks omitted)).